[No. B203476. Second Dist., Div. Eight. July 6, 2009.]

DERAIN CLARK et al., Plaintiffs and Respondents, v.
AMERICAN RESIDENTIAL SERVICES LLC et al., Defendants and
Respondents;
JERRSON NALUZ et al., Objectors and Appellants.

**COUNSEL**

Law Office of Randall Crane, Randall C. Crane and Leonard Emma for Objectors and Appellants.

Law Office of Kevin T. Barnes, Kevin T. Barnes, Gregg Lander; Law Office of Joseph Antonelli, Joseph Antonelli and Janelle C. Carney for Plaintiffs and Respondents.

Winston & Strawn, Lee T. Paterson, Amanda C. Sommerfeld and Emilie C. Woodhead for Defendants and Respondents.

**OPINION**

**BAUER, J.[*]—**

## SUMMARY

Derain Clark and Maxine Gaines filed a class action lawsuit against American Residential Services LLC (ARS), a purveyor of plumbing and related services, seeking damages and penalties for allegedly unpaid minimum and overtime wages, failure to provide meal and rest periods, and other Labor Code violations and unfair business practices. Eighteen months later, after a one-day mediation before a respected mediator, the parties agreed to settle the matter for $2 million, out of which Clark and Gaines would receive $25,000 each, and the other 2,360 class members would receive an average payment of $561.44. Notice of the proposed settlement elicited objections from 20 putative class members, who alleged that they worked at least two

---

[*]Judge of the Orange Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

hours of unpaid overtime every workday, that they would be compensated for only about 1 percent of the total value of their claims, and that no evidence was presented to the court to justify the settlement. After a hearing, the trial court gave final approval to the settlement. Objectors appealed.

We conclude the order approving the settlement must be vacated because the trial court lacked sufficient information to make an informed evaluation of the fairness of the settlement. This was due to the court's apparent reliance on counsel's evaluation of the class's overtime claim as having "absolutely no" value, without regard to objectors' claim that counsel's evaluation was based on an allegedly "staggering mistake of law." While the court need not determine the ultimate legal merit of a claim, it is obliged to determine, at a minimum, whether a legitimate controversy exists on a legal point, so that it has some basis for assessing whether the parties' evaluation of the case is within the "ballpark" of reasonableness. We further conclude that the court abused its discretion in finding that the $25,000 enhancements for Clark and Gaines were fair and reasonable, and that it erred in awarding costs greater than the maximum amount specified in the notice given to the class.

## FACTUAL AND PROCEDURAL BACKGROUND

On April 28, 2005, Clark and Gaines (collectively, Clark) filed their class action complaint against ARS and related defendants. Clark asserted causes of action for unpaid minimum and overtime wages, failure to provide meal and rest periods, failure to fully reimburse employees for business expenses, illegal uniform deductions, failure to timely furnish accurate itemized wage statements, violations of Labor Code section 203 (penalties for late payment of wages to terminated employees), and unfair business practices.[1] The complaint involved two types of workers: (1) service technicians (Clark's job), paid on a commissioned basis or hourly wage, whichever was higher, and (2) hourly paid positions, including dispatchers and customer service representatives (Gaines's job), paid on an hourly basis.[2]

ARS filed an answer on June 16, 2005.

In December 2005, ARS removed the case to federal court, but, in February 2006, Clark's motion to remand was granted, the federal court finding ARS did not meet its burden of proving that the amount in controversy exceeded $5 million (as required under the Class Action Fairness Act of

---

[1] The first amended complaint, filed pursuant to stipulation of the parties on May 8, 2007, added a cause of action for violation of Labor Code section 212, which prohibits an employer from paying wages in a form that is not negotiable and payable in cash, on demand and without discount.

[2] The causes of action for failure to pay minimum wages, failure to reimburse for business expenses, and taking illegal uniform deductions were asserted only as to the service technicians.

2005 (28 U.S.C. § 1332(d)(2))). After additional discovery, including depositions of Clark and Gaines in May 2006, ARS filed another notice of removal on August 10, 2006. ARS, with a supporting expert declaration, asserted that, assuming the allegations in the complaint and the deposition testimony of Clark and Gaines were true (which it did solely for purposes of the removal motion), the amount in controversy was between $21.7 million and $32.8 million. On December 20, 2006, the federal court again remanded the case to the superior court, finding that, because ARS did not identify how many of the putative class members worked under conditions similar to those of the named plaintiffs, and its expert's calculations were based entirely on the assumption that plaintiffs' damages were the same or similar to every class member's damages, the calculations were "fatally vague."

Meanwhile, on October 18, 2006, a one-day mediation was held before a well-respected mediator with significant experience in wage and hour class action suits, who negotiated the principal terms of a settlement, with a more formal agreement to be memorialized in the future; ARS agreed to pay a total amount of $2 million, inclusive of attorney fees and costs.

Clark filed a motion for preliminary approval of the class action settlement, presenting the court with a proposed stipulated settlement agreement. The proposed settlement called for a class of all persons who were employed by ARS any time from April 28, 2001, through December 31, 2006, as service technicians, customer service representatives and/or dispatchers. Clark's motion stated the settlement would provide a payment of approximately $6.43 per workweek for each class member submitting a claim,[3] attorney fees of $600,000, costs of up to $40,000, and class representative enhancements of $50,000 ($25,000 each). The evidentiary support for the settlement consisted of the declaration of plaintiffs' counsel, Kevin Barnes, who stated:

—"[T]he settlement for each participating Class Member is fair, reasonable, and adequate given the inherent risk, cost and length of litigation. The amount recoverable for each Class Member . . . is fair and reasonable based in a review of all objective evidence. The parties' assessment of the matter is based on extensive research for and during the litigation, written discovery, Depositions of the Plaintiff Class Representatives, and after consultation with an economist regarding potential damage exposure."[4]

---

[3] The notice sent to class members indicated each member would be paid approximately $6.51 per compensable workweek.

[4] The stipulated settlement describes the discovery and investigation conducted: "This discovery and investigation has included *inter alia*, (i) review of documents produced by Defendants and Class Representatives; (ii) review of written discovery responses produced by Defendants; (iii) interviews with percipient witnesses and putative Class Members; (iv) consultation with consultants and retained experts; (v) participation in a mediation with a

—Counsel believed the $25,000 enhancements for Clark and Gaines were also fair and reasonable, because they initially informed counsel of ARS's illegal policies and procedures; spent several hours in consultation with counsel's office; remained in contact with counsel's office throughout the litigation and settlement process; reviewed thousands of pages of documents for the mediation; Gaines attended the mediation, which lasted a full day; and Clark and Gaines had their depositions taken for a full day. In addition, they assumed the financial risk of paying costs "of tens of thousands of dollars" if ARS prevailed at trial.

On May 8, 2007, the court gave preliminary approval to the class action settlement, and on May 22, 2007, notice of pendency of the settlement was mailed to 2,821 potential class members.

A month later, Clark moved for final approval of the settlement, arguing the settlement agreement was entitled to a presumption of fairness where the agreement is reached through arm's-length bargaining; investigation and discovery are sufficient to allow counsel and the court to act intelligently; counsel is experienced in similar litigation; and the percentage of objectors is small (citing *Dunk v. Ford Motor Co.* (1996) 48 Cal.App.4th 1794, 1802 [56 Cal.Rptr.2d 483] (*Dunk*)), all of which conditions were present.[5] Only 23 of the 2,821 class members opted out.

In support of the motion for final approval, Clark presented a declaration from Class Counsel Barnes who, on the issue of fairness, stated that: "Class Counsel are experienced and qualified to evaluate the Class claims and viability of the defenses. The recovery for each Class Member in the present [action] is very generous on account of the close proximity of the Class

---

well known and respected mediator; and (vi) research of the applicable law with respect to the claims asserted in the Complaint and the potential defenses thereto. Defendants . . . have also deposed the Class Representatives and obtained relevant documents and information through discovery."

[5] With respect to the arm's-length negotiations, Clark's memorandum recounted that: "[ARS] believed and maintained that the Class could not be certified, it had a good chance of defeating the claims on the merits, to wit, that the purported Class Members were properly paid as exempt employees. Furthermore, [ARS] and [Clark] were in a legitimate dispute over various defenses available to [ARS]. [ARS] was faced with the prospect of lengthy and expensive litigation against experienced Class Counsel and no insurance coverage for the Class claims. [¶] On the other hand, while Class Counsel was ultimately confident in the merits of its legal position, Plaintiffs were put in the position of negotiating a settlement at this juncture or face years of litigation to achieve a verdict that may not have been collectible for additional numerous years due to potential appellate issues, and years of litigation over the precise amount of overtime worked by each Class Member. . . ."

Members' recovery to what they would have received had they received compensation for all hours worked. This settlement is fair, adequate and reasonable and in the best interests of the Class." As to the $25,000 enhancements for Clark and Gaines, Barnes repeated the information given in the request for preliminary approval of the settlement, and noted as well that Clark and Gaines agreed to a complete release of all claims (wage related or not) in exchange for the enhancement. Declarations to the same effect were submitted from Clark and Gaines, both also noting they risked "the potential stigma of being a Class Representative in a class action labor dispute which may affect my future employability in this industry," and that other class members they spoke to felt the enhancement was fair and reasonable.

On July 5, 2007, 20 class members, represented by the Law Office of Randall Crane, filed objections to the proposed settlement. Their declarations stated they had approached the Crane office for representation in mid-May, unaware of the Clark action, because ARS was not paying them for overtime, among other reasons; they declared that they worked, on average, more than two hours of overtime every workday; frequently worked more than 12 consecutive hours without being paid overtime; and in fact were never paid for any overtime. They argued that the proposed settlement was "a near-total loss for class members," compensating them for approximately 1 percent of the total value of their claims; and no evidence had been presented to the court to justify the settlement: no evidence regarding the likelihood of success of any of the 10 causes of action, the number of unpaid overtime hours estimated to have been worked by the class, the average hourly rate of pay, or the number of meal periods and rest periods missed, the value of minimum wage violations, and so on. As a result, they contended, the court had no basis on which to exercise its discretion to determine whether the settlement was fair, adequate and reasonable.

On July 13, 2007, in opposition to the objections, ARS's counsel, Amanda Sommerfeld, filed a declaration describing the evidence ARS presented at the mediation. Sommerfeld stated:

—Putative class members were paid for daily and weekly overtime during the class period, and both named plaintiffs validated the accuracy of their time records. Thus:

> —Clark was clocked in and out of work by a dispatcher and was paid overtime for every hour over eight in a day or 40 in a week; he received 85.4 hours of overtime pay in 2003 and 84.3 hours of overtime pay in 2004. Clark admitted he clocked in and out by calling dispatchers, and at his deposition he verified his signature on all but one of his timecards; he had no specific recollection

whether any of the records were inaccurate when he signed them, kept no personal calendars of his hours and had no way to reconstruct his hours independently from the timecards.

—Gaines's payroll records showed she worked and was paid for 48.8 hours of overtime in 2001, 122 hours in 2002, 66 hours in 2003 and 52.8 hours in 2004. Gaines verified that all the timecards with her signature were accurate.

—As to meal periods, ARS had policies and procedures for accurately recording time worked and meal periods, requiring employees to clock in and clock out and to sign a timesheet once a week verifying the accuracy of their timesheets, and requiring employees to take their meal periods. Class members were responsible for keeping their own time records. ARS made meal and rest periods available, and class members were free to take their meal and rest periods. Service technicians were in charge of their own work schedules during the day and had free time during which they could take their meal and rest periods. As to Clark and Gaines:

—Clark contradicted himself as to whether or not he knew that meal periods were mandatory, testified he signed meal period activity forms without reading the legend stating meal periods were mandatory, and ultimately admitted he had no recollection of whether or not he took the meal periods.

—Gaines testified her meal period activity forms were accurate (but later contradicted herself by denying their accuracy).

—ARS reimbursed service technicians for purchases of tools and provided them with 11 pairs of uniforms which were laundered by ARS; while there was a written memo that missing or damaged uniforms would be deducted at termination, the memo was not enforced.

—ARS presented evidence that both Clark and Gaines perjured themselves in their depositions. Clark claimed to have no memory of many facts, including when he was hired and fired by ARS, his scheduled shift times, and which days of the week he worked; he claimed to have worked for ARS until he started his own business (three months prior to the deposition), and then, after being scolded by his lawyer, admitted he did not work at all between the time he left ARS and started his own business. Gaines contradicted herself, first saying her time records looked correct and later saying that even when she signed meal period forms, she did not get a 30-minute meal period.

—There was an inherent conflict of interest between service technicians (who claimed they were not paid for all hours worked) and customer service representatives/dispatchers (who were responsible for clocking service technicians in and out in ARS's computerized timekeeping system). "If [Gaines] and other Dispatchers fraudulently entered incorrect times for the Service Technicians, then she and those Dispatchers violated [ARS's] policies and the law, thereby depriving Service Technicians of the wages they were due."

Sommerfeld attached to her declaration a copy of ARS's PowerPoint presentation from the mediation. On the subject of overtime, this consisted of (1) a copy of ARS's overtime policy, which states that hourly, nonexempt employees are paid an overtime rate of one and one-half times their regular rate of pay for hours in excess of 40 per workweek, except in states where local law requires overtime pay in a different manner, and (2) a few pages of signed time records and pay stubs for Clark and Gaines showing payments for overtime.

On July 16, 2007, objectors filed a reply to ARS's opposition, asserting among other things that the evidence presented in ARS's opposition was untimely (the fairness hearing was then scheduled for July 17); the evidence was misleading because it presented "just one side of the story," and objectors comprised about 1 percent of the class—and were 10 times as numerous as the named plaintiffs, who were receiving 44 times the recovery of the average class member. Objectors also filed an ex parte application for leave to intervene in the action.

On July 17, the trial court continued the fairness hearing until August 29, 2007. Objectors then supplemented their opposition to the settlement, pointing out that in its removal application, ARS's expert had valued the lawsuit in the range of $21.7 to $32.8 million, and the only evidence presented in support of the proposed settlement was "inadmissible and devoid of any reasoned damages calculations."

Finally, on August 14, 2007, two weeks before the fairness hearing, Class Counsel Barnes submitted another declaration, evaluating the entire case at "approximately $2,351,605.61." Barnes stated:

—As to overtime: While initially believing their strongest cause of action was for overtime compensation for service technicians, plaintiffs "have determined that there are no damages whatsoever for the overtime cause of action," as ARS "had a legally compliant overtime policy and they actually paid overtime premium pay pursuant to their compensation policy." Thus:

> —ARS's policy was to pay service technicians an hourly minimum wage, unless their revenue for commissions met a minimum

threshold (either on a commissioned basis, or minimum wage plus overtime compensation, whichever was greater).

—ARS provided data showing the average service technician earned approximately $40,000 per year.

—Therefore, even if a service technician worked as many as 20 hours of overtime work on a weekly basis, there would be no damages. Barnes illustrated with a hypothetical:

> —A technician earns $40,000 a year in commission compensation;
>
> —The minimum wage is $7.50 per hour for the class period;
>
> —The overtime rate would be $3.75 per hour (half of the hourly wage, because the commission plan was on a piece-rate system so the technician has already been paid for hours worked and so is entitled to only 0.5 of the hourly rate for overtime hours).
>
> —Assuming the technician worked 20 hours of overtime per week, he would be entitled to $75.00 in unpaid overtime compensation ($3.75 times 20 hours = $75.00).
>
> —The technician would earn $300 per week if he were receiving the minimum wage ($7.50 times 40 hours). Adding $75.00 in unpaid overtime, he would only be earning $375 per week.
>
> —Service technicians earned approximately $40,000 per year, or $770 per week. So even with 20 hours of overtime, "they were still earning over twice as much in wages as they would if they had been paid overtime. Therefore, there are absolutely no damages on the overtime cause of action."

—As to meal periods: ARS had a written policy requiring service technicians to advise ARS when they took lunch so they could be clocked in and out. While documentary records did not support Clark's allegation of three meal period violations a week, three violations at $7.50 per hour would equal $22.50 per week per employee, or $3,779,597.20 (assuming 167,982.1 work-weeks for all class members). There were serious risks in certifying a meal

period case when ARS's written policies and timesheets show that all meals were taken, and plaintiffs' evidence would be testimony contradicting the records. Counsel believed they had a 60 percent chance of certifying the meal period case, for a potential claim of $2,267,758.32.

—As to rest periods: ARS had a policy that employees were to take rest periods, and, at the time of settlement, the question whether a rest period claim was a wage or penalty claim was very much in dispute; very few rest period claims are certified and counsel believed the rest period case "was basically of no value."

—The uniform claim was for service technicians only and was based on a charge by ARS of $30 per year ($0.58 per workweek) per employee for uniforms. Counsel believed this was a clear liability claim with a 100 percent chance of certification, valued at $83,847.29. The evidence showed ARS provided uniforms and laundering.

—The tool expense cause of action had no value, because an employee whose wages are at least twice the minimum wage may be required to provide and maintain handtools and equipment. Here, the service technicians earned about $40,000, well in excess of twice the minimum wage.

Class counsel thus believed the total value of the case was approximately $3,863,444.49 with no reduction for risk factors; with a 60 percent chance of certification on the meal claim and 100 percent recovery on the uniform claim, the settlement value was "approximately $2,351,605.61."

At the August 29 fairness hearing, counsel for objectors responded to class counsel's claim that "there are absolutely no damages on the overtime cause of action," asserting this reflected a "staggering mistake of law . . . ." He asserted that (contrary to Barnes's hypothetical) overtime for commission workers cannot be calculated on a minimum wage, disregarding the commission for purposes of overtime. Rather, to find the overtime rate, the amount of a commission check is divided by the number of hours worked to obtain the regular rate, and that rate is multiplied by 0.5 for the overtime hours. Objectors' counsel stated it was "hard to express how incorrect that is [disregarding the commission earned for purposes of overtime]."[6] Class counsel "respectfully disagree[d] on the law."

---

[6] Objectors' counsel urged: "It [whether the class was entitled to an overtime rate based on the minimum wage or on their true wage] hadn't even come out in the papers until Mr. Barnes responded to the objection . . . where he comes up with a—what Ronald Reagan called voo-doo economics, where he said even if these people were underpaid overtime, they got it anyway, because the commission made up for what they lost in overtime based on some

After hearing from counsel, the court stated: "The court has considered the arguments of counsel, as well as considered what's been presented to the court and the moving papers and the objections. [¶] And, you know, I do want to make clear, I wasn't deferring to the mediator in terms of anything; however, the fact that a mediator has been involved is an indicator that this is an arms-length transaction, that this isn't a product of collusion, that there's a third party who is involved in this case and trying to facilitate their resolution. [¶] It does appear to the court that there was sufficient investigation and discovery undertaken on this case for the parties to perceive that counsel is experienced in this type of litigation. And, you know, I don't know how you figure it any other way than the number of objectors is small, less than one percent. It's a small number of objectors. [¶] Therefore, I think we do have a presumption of fairness. I don't think that there's anything sufficiently brought to the court to rebut that presumption. And for that reason, the court is going to grant the request to sign the order granting final approval of the settlement . . . ."

The court signed the order approving the settlement, finding the enhancements for Clark and Gaines to be fair and reasonable and awarding $600,000 as attorney fees, $26,199.27 as costs of litigation, and $18,375 for claims administrator fees (for a total expense of $44,574.27). Objectors filed a timely appeal.

## DISCUSSION

Our review of the trial court's approval of a class action settlement is limited in scope. We make no independent determination whether the settlement terms are "fair, adequate and reasonable," but only determine whether the trial court acted within its discretion. (*Kullar v. Foot Locker Retail, Inc.* (2008) 168 Cal.App.4th 116, 127–128 [85 Cal.Rptr.3d 20] (*Kullar*).)[7] Here, it did not, because the court did not receive and consider sufficient information on a core legal issue, affecting the strength of the case for plaintiffs on the merits, to make the requisite independent assessment of the reasonableness of the terms of the settlement. (168 Cal.App.4th at pp. 130, 133.) We also conclude the enhancement or incentive awards were excessive, and that the award of costs in excess of the maximum amount stated in the notice to the class was improper.

---

piecework theory which he took out of the air. There is no way that you can approve this settlement and grant final approval based on this record. There is nothing in the record to justify that."

[7] Because of the " ' "many imponderables" ' " that enter into a settlement evaluation, " 'an abuse of discretion standard of appellate review is singularly appropriate.' " (*Kullar, supra,* 168 Cal.App.4th at p. 128.)

We recount first the legal principles governing the approval of a class action settlement, and then turn to the particulars in this case.

### A. *The applicable principles.*

The trial court must determine whether a class action settlement is fair and reasonable, and has broad discretion to do so. That discretion is to be exercised through the application of several well-recognized factors. The list, which " 'is not exhaustive and should be tailored to each case,' " includes " 'the strength of plaintiffs' case, the risk, expense, complexity and likely duration of further litigation, the risk of maintaining class action status through trial, the amount offered in settlement, the extent of discovery completed and the stage of the proceedings, the experience and views of counsel, the presence of a governmental participant, and the reaction of the class members to the proposed settlement.' " (*Kullar, supra,* 168 Cal.App.4th at p. 128, quoting *Dunk, supra,* 48 Cal.App.4th at p. 1801.) " ' "The most important factor is the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement." ' " (*Kullar, supra,* 168 Cal.App.4th at p. 130.) While the court " 'must stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case,' " it " 'must eschew any rubber stamp approval in favor of an independent evaluation.' " (*Ibid.*)

In *Dunk,* the court observed that "a presumption of fairness exists where: (1) the settlement is reached through arm's-length bargaining; (2) investigation and discovery are sufficient to allow counsel and the court to act intelligently; (3) counsel is experienced in similar litigation; and (4) the percentage of objectors is small." (*Dunk, supra,* 48 Cal.App.4th at p. 1802.) But *Kullar* makes clear that this is only an *initial* presumption. The point is cogently made in *Kullar,* where the trial court's approval of a class action settlement was vacated because the court "[was] not provided with basic information about the nature and magnitude of the claims in question and the basis for concluding that the consideration being paid for the release of those claims represents a reasonable compromise." (*Kullar, supra,* 168 Cal.App.4th at p. 133.)

In *Kullar,* the court pointed out that "neither *Dunk* . . . nor any other case suggests that the court may determine the adequacy of a class action settlement without independently satisfying itself that the consideration being received for the release of the class members' claims is reasonable in light of

the strengths and weaknesses of the claims and the risks of the particular litigation." (*Kullar, supra,* 168 Cal.App.4th at p. 129.) *Kullar* continues: "The court undoubtedly should give considerable weight to the competency and integrity of counsel and the involvement of a neutral mediator in assuring itself that a settlement agreement represents an arm's-length transaction entered without self-dealing or other potential misconduct. While an agreement reached under these circumstances presumably will be fair to all concerned, particularly when few of the affected class members express objections, *in the final analysis it is the court that bears the responsibility to ensure that the recovery represents a reasonable compromise, given the magnitude and apparent merit of the claims being released, discounted by the risks and expenses of attempting to establish and collect on those claims by pursuing the litigation.* 'The court has a fiduciary responsibility as guardians of the rights of the absentee class members when deciding whether to approve a settlement agreement.' " (*Kullar, supra,* 168 Cal.App.4th at p. 129, italics added.)

■ *Kullar* further explains that, while there is usually an initial presumption of fairness when a proposed class action settlement was negotiated at arm's length by counsel for the class, " 'to protect the interests of absent class members, the court must independently and objectively analyze the evidence and circumstances before it in order to determine whether the settlement is in the best interests of those whose claims will be extinguished.' "[8] (*Kullar, supra,* 168 Cal.App.4th at p. 130.) To make that determination, " 'the factual record before the . . . court must be sufficiently developed,' " and the initial presumption to which *Dunk* refers " 'must then withstand the test of the plaintiffs' likelihood of success.' " (*Kullar,* at p. 130.) Again, " ' "The most important factor is the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement." ' " (*Ibid.*) In *Kullar,* because the trial court was not presented with data permitting it to review class counsel's evaluation of the sufficiency of the settlement, the order approving the settlement was vacated.[9] (*Kullar, supra,* 168 Cal.App.4th at p. 131.) As we shall see, the same result is required here.

---

[8] *Kullar* points out that, while *Dunk* asserts there is a presumption of fairness where the four factors it identifies are established, in fact *Dunk* is fully consistent with "this recognition of the court's responsibility"; there was a "voluminous record" before the *Dunk* trial court, which "was made aware of the maximum damages that each class member had sustained and the value of the coupons that each class member would receive under the settlement, as well as of the particular issues that the plaintiffs needed to overcome in order to prevail in the litigation." (*Kullar, supra,* 168 Cal.App.4th at p. 130, citing *Dunk, supra,* 48 Cal.App.4th at p. 1802.)

[9] "Whatever information may have been exchanged during the mediation, there was nothing before the court to establish the sufficiency of class counsel's investigation other than their assurance that they had seen what they needed to see. The record fails to establish in any meaningful way what investigation counsel conducted or what information they reviewed on which they based their assessment of the strength of the class members' claims, much less does the record contain information sufficient for the court to intelligently evaluate the

B.  *The settlement in this case.*

Applying the principles enunciated in *Kullar* and recognized in *Dunk* and other cases, we are compelled to find the trial court abused its discretion in approving the settlement.

### 1.  *The absence of information on a core legal issue.*

We begin with *Kullar*'s observation that an informed evaluation of a proposed settlement cannot be made without an understanding of the amount that is in controversy and the realistic range of outcomes of the litigation. (*Kullar, supra*, 168 Cal.App.4th at p. 120.) In this case, the court's order granting final approval, while finding the settlement was "the product of serious, informed, non-collusive negotiations" and was "fair, reasonable and adequate," gives no hint as to the court's "independent assessment of the adequacy of the settlement terms." (*Kullar, supra*, 168 Cal.App.4th at p. 132.) The court's comments at the hearing show only that it found the settlement was entitled to "a presumption of fairness"—based on arm's-length bargaining with a respected mediator, sufficient investigation and discovery, counsel with experience in similar litigation, and a small number of objectors—and there was nothing "sufficiently brought to the court to rebut that presumption." Thus the court seems to have accepted ARS's contention—which ARS repeats on appeal—that objectors "had the burden of rebutting the presumption before the trial court," and "were required to present evidence showing that the settlement was *unfair*" based upon criteria including the strength of the case, the amount offered in settlement, and the other factors recognized in the cases. (Italics added.) While we question that formulation, one point is certain: it is the trial court's duty, whether or not there are objectors, to employ those factors to evaluate independently the fairness of a proposed settlement.

In any event, the record before the trial court in this case did not contain the information required for "an understanding of the amount that is in controversy and the realistic range of outcomes of the litigation." (*Kullar, supra*, 168 Cal.App.4th at p. 120; see *id.* at p. 132 ["data must be provided that will enable the court to make an independent assessment of the adequacy of the settlement terms"].) This is vividly demonstrated in connection with the cause of action for unpaid overtime for the service technicians, which plaintiffs "[o]riginally . . . believed [to be] their strongest cause of action . . . ." Two weeks before the final fairness hearing, class counsel finally provided an evaluation of plaintiffs' case, which described the overtime claim as having "absolutely no" value. No data was included to support counsel's evaluation

---

adequacy of the settlement. Assuming that there is a 'presumption' such as *Dunk* asserts, its invocation is not justified by the present record." (*Kullar, supra*, 168 Cal.App.4th at p. 129.)

(and the only data anywhere in the record was a copy of ARS's overtime policy, stating it paid overtime at one and a half times the employee's regular rate, along with a couple of pay stubs and timesheets showing some overtime payments to Clark and Gaines). Instead, counsel stated that ARS had "a legally compliant overtime policy and they actually paid overtime premium pay pursuant to their compensation policy." He then pointed out that the average technician earned $40,000 a year, and "[t]herefore" even if a technician worked as many as 20 hours of overtime every week, he would incur no damages. This was because his overtime rate, based on a minimum wage of $7.50, would be $3.75, and 40 hours plus 20 hours of overtime at the minimum wage would result in earnings of only $375 per week (whereas the technicians actually earned an average of $770 per week, "over twice as much in wages as they would if they had been paid overtime").[10]

When objectors protested, at the fairness hearing, that overtime is to be calculated on the technician's actual commission wages, not on the minimum wage, and contended that class counsel's evaluation was thus based on a "staggering mistake of law," the trial court made no comment, and proceeded to approve the settlement. This, it seems to us, demonstrates the court made no independent assessment of the strength of plaintiffs' case, simply accepting class counsel's assessment of value, including his assertion that the overtime claim—which "is what this [case] was about"—had "absolutely no" value. But if in fact there is a legitimate dispute on the appropriate way to calculate overtime, then the class's overtime claim obviously has some value, and if objectors were correct on the law, the claim may have had considerable value. None of these possibilities was considered or evaluated when the trial court approved the settlement; instead, the trial court simply accepted class counsel's assessment. Without some kind of evaluation of this legal point— and in light of declarations from objectors stating they worked at least 10 hours of overtime every week without compensation—we cannot see how the trial court could "satisfy itself that the class settlement is within the 'ballpark' of reasonableness." (*Kullar, supra*, 168 Cal.App.4th at p. 133.)

Objectors, of course, raise this point in their opening brief, contending at some length that class counsel misunderstood and misapplied California overtime rules. Clark did not respond to objectors' legal argument, asserting that the "resolution of that issue . . . requires a determination of the merits" which is "plainly impermissible and not an appropriate area of inquiry in determining whether a particular settlement agreement is fair." ARS similarly argues that the trial court "wisely stayed within its discretion and did not make an improper ruling of law on the merits of the Plaintiffs' and class

---

[10] This calculation, even if counsel's overall point were correct, is clearly wrong, since in the hypothetical the worker is paid the minimum wage for 40 hours, and only half the minimum wage for his 20 overtime hours, instead of 1.5 times the minimum wage.

members' overtime claims." Both Clark and ARS cite *7-Eleven Owners for Fair Franchising v. Southland Corp.* (2000) 85 Cal.App.4th 1135 [102 Cal.Rptr.2d 777] (*7-Eleven*). *7-Eleven* tells us that neither the trial court nor this court has " 'the right or the duty to reach any ultimate conclusions on the issues of fact and law which underlie the merits of the dispute,' " and the appellate court " ' "need not and should not reach any dispositive conclusions on the admittedly unsettled legal issue." ' " (*Id.* at p. 1146.)

**(6)** We do not disagree with the proposition that the court need not reach any "ultimate" or "dispositive" conclusions on legal or factual issues; as *7-Eleven* aptly observes, "the operative word is 'settlement.' " (*7-Eleven, supra*, 85 Cal.App.4th at p. 1150.) But while "ultimate" or "dispositive" conclusions are not necessary, it is not possible for a court to evaluate " ' "the strength of the case for plaintiffs on the merits" ' " (*Kullar, supra*, 168 Cal.App.4th at p. 130) with no regard at all for whether or not a legal issue exists that may have a significant impact on the value of the claim. And we do not read *7-Eleven* to suggest otherwise.[11] The simple fact is that " '[t]he proposed settlement cannot be judged without reference to the strength of plaintiffs' claims' " (*Kullar, supra*, 168 Cal.App.4th at p. 130), and the strength of a claim cannot be judged without reference to the legal terrain in which it operates (cf. *id.* at pp. 132–133 [settling parties should provide "a meaningful and substantiated explanation of the manner in which the factual and legal issues have been evaluated"]; *id.* at p. 129 ["no analysis was provided of the factual or legal issues that required resolution to determine the extent of any one-hour-pay penalties to which class members may have been entitled"]).

In short, the trial court is obliged, at a minimum, to determine whether a legitimate controversy exists on a legal point, if that legal point significantly affects the valuation of the case for settlement purposes. Here, the trial court simply accepted class counsel's conclusion the overtime claim had "absolutely no" value, without a "substantiated explanation" of the manner in which a core legal issue was evaluated. (See *Kullar, supra*, 168 Cal.App.4th at pp. 132–133.) The court thus lacked a sufficient basis to "satisfy itself that the class settlement is within the 'ballpark' of reasonableness" (*id.* at p. 133), and therefore abused its discretion in approving the settlement. While we have noted at length the absence of any reasoned analysis of the legal merits of

---

[11] In *7-Eleven* there were three day-long evidentiary hearings, and the court was apprised of the details of the claims and defenses and the manner in which counsel evaluated the strengths of each of the claims. The trial judge remarked that he had " 'looked at these contract provisions and [had] serious reservations about whether there have been breaches sufficient even to bring these damages issues into account with the singular exception of the equipment allowances.' " (*7-Eleven, supra*, 85 Cal.App.4th at p. 1151.)

this class's claim for overtime pay, we must note that counsel acknowledged at oral argument that the factual bases for this settlement have also not been fully developed.

### 2. *The enhancements for the named plaintiffs.*

We also conclude that it was an abuse of discretion to permit incentive or enhancement awards of $25,000 each to Clark and Gaines in the circumstances of this case.

■ In *Matter of Continental Illinois Securities Litigation* (7th Cir. 1992) 962 F.2d 566, 571 (*Continental Illinois*), the court noted the "threshold question . . . whether a named plaintiff is ever entitled to a fee," and answered the question in the affirmative. "Since without a named plaintiff there can be no class action, such compensation as may be necessary to induce him to participate in the suit could be thought the equivalent of the lawyers' nonlegal but essential case-specific expenses, such as long-distance phone calls, which are reimbursable."[12] (*Continental Illinois*, at p. 571.) Subsequent cases have reiterated that an incentive award is appropriate "if it is necessary to induce an individual to participate in the suit," and have noted "relevant factors" to consider in deciding whether such an award is warranted. (*Cook v. Niedert* (7th Cir. 1998) 142 F.3d 1004, 1016 (*Cook*).) Those factors include "the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation." (*Ibid.*) Federal district courts have identified other factors as well, including "the risk to the class representative in commencing suit, both financial and otherwise," "the notoriety and personal difficulties encountered by the class representative," the duration of the litigation, and "the personal benefit (or lack thereof) enjoyed by the class representative as a result of the litigation."[13] (*Van Vranken v. Atlantic Richfield Co.* (N.D.Cal. 1995) 901 F.Supp. 294, 299.)

---

[12] *Continental Illinois* affirmed the trial court's refusal to award any money to the named plaintiff, for whom an award of $10,000 was sought from a $45 million settlement, for what the court described as "modest services"; the plaintiff "was deposed, which took a few hours, and bore a slight risk of being made liable for sanctions, costs, or other fees should the suit go dangerously awry." (*Continental Illinois, supra,* 962 F.2d at pp. 568, 571–572.) The trial court had concluded the plaintiff's risk was negligible because the case was a "clear winner" and if the plaintiff dropped out there were "plenty of others" to take his place without demanding compensation. (*Id.* at p. 572.) The Seventh Circuit concluded the plaintiff had failed to prove his entitlement to a fee. (*Ibid.*)

[13] In securities fraud class actions, the Private Securities Litigation Reform Act of 1995 requires the representative party's share of a settlement to be equal to that awarded all other class members, except for "the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class . . . ." (15 U.S.C. § 78u-4(a)(4).)

In *Cook*, the Seventh Circuit affirmed the propriety of a $25,000 incentive award to the named plaintiff in a suit alleging pension fund mismanagement. The court found the relevant factors were "readily satisfied," where the lawsuit resulted in "substantial structural reforms" to the pension fund as well as a cash recovery of more than $13 million. (*Cook, supra,* 142 F.3d at pp. 1016, 1008.) In addition, a special master, "[i]n findings that were well-supported by the evidence," noted that plaintiff Cook "spent hundreds of hours with his attorneys and provided them with an 'abundance of information,' " and "[m]ost significantly . . . found that, in filing the suit, Cook reasonably feared workplace retaliation." (*Id.* at p. 1016.) The court of appeals found no error in the incentive award, "[i]n light of the benefit Cook bestowed on his class, the risks he faced in bringing the case and the time he spent pursuing it . . . ." (*Ibid.*)

In this case, the court found the enhancements of $25,000 each for Clark and Gaines to be "fair and reasonable," but offered no rationale for why this was so. The record shows, with regard to time spent on the litigation, that Clark and Gaines spent "several hours" in initial consultations with counsel, had their depositions taken for a full day, and Gaines attended a full-day mediation; in addition, both reviewed "thousands of pages" of documents for the mediation. But, except to say they spent "countless hours" participating in the prosecution of the case, no further quantification of the time Clark and Gaines spent appears in the record. As to the actions taken to protect the interests of the class, or the risk to the class representatives in commencing suit, the record contains only conclusory declarations claiming a "potential stigma" that "may affect . . . future employability in this industry" and "the potential risk of being liable for [ARS's] costs if we were unsuccessful in this lawsuit." And as to the degree to which the class has benefitted from the named plaintiffs' actions, we have a $2 million settlement in which the average recovery for class members is just over $550.

■ An enhancement that gives the named plaintiffs at least 44 times the average payout to a class member simply cannot be justified on the record in this case. (While Clark and Gaines say they spent "countless hours" on this case, a $25,000 enhancement would compensate them, if they were paid, say, $50 an hour—a rate we do not suggest would be justified—for 500 hours, or more than 12 weeks of full-time work.) Moreover, the trial court is not bound to, and should not, accept conclusory statements about "potential stigma" and "potential risk," in the absence of supporting evidence or reasoned argument explaining why, under the particular circumstances, an actual—not a negligible—risk existed, or why it might be difficult to get plaintiffs to come forward to prosecute a particular case. This case is nothing like *Cook*, for example, where a $25,000 incentive award was appropriate for results that included a $13 million recovery and structural reforms, and where there were

factfindings that the plaintiff spent "hundreds of hours" on the litigation and reasonably feared workplace retaliation. (*Cook, supra*, 142 F.3d at p. 1016.)

■ Clark insists that the mere disparity between the class representatives' recovery and the class members' recovery "is insufficient to overcome the presumption of fairness and fails to demonstrate that the trial court abused its discretion in approving the enhancement." Clark also cites a number of federal district court cases in which the trial court approved enhancements of $25,000 or more. These contentions are unavailing. First, there is no "presumption of fairness" as to the amount of an enhancement. Second, the trial court abused its discretion not merely because of the enormous disparity in recovery, but because, as we have explained, the evidence in the record is entirely insufficient to support an enhancement of the magnitude awarded. Third, the trial court cases Clark cites have not been subjected to appellate review, and hence are not precedents to which we accord any deference.[14] And the appellate cases cited by the parties in no way contradict the conclusion we reach here; indeed, they support it. (See, in addition to *Continental Illinois* and *Cook, Staton v. Boeing Co.* (9th Cir. 2003) 327 F.3d 938, 978, 977, 944 [trial court abused its discretion in finding the settlement agreement to be fair because "the very large differential in the amount of damages awards between the named and unnamed class members [was] not justified on this record . . ."; payments to named plaintiffs averaged more than $30,000 in a $7.3 million settlement, and while named plaintiffs "are eligible for reasonable incentive payments," the district court "must evaluate their awards individually, using 'relevant factors' "]; see also *In re US Bancorp Litig.* (8th Cir. 2002) 291 F.3d 1035, 1038 [approving, without discussion, $2,000 incentive awards to five named plaintiffs in a settlement of $3 million]; *In re Mego Fin. Corp. Sec. Litig.* (9th Cir. 2000) 213 F.3d 454, 456–457, 463 [approving, without discussion, incentive awards of $5,000 each to two class representatives from a settlement of $1.725 million, plus interest].)

In short, the rationale for making enhancement or incentive awards to named plaintiffs is that they should be compensated for the expense or risk they have incurred in conferring a benefit on other members of the class. (Cf. *Continental Illinois, supra*, 962 F.2d at p. 571.) Here, we simply cannot sanction, as within the trial court's discretion, incentive awards totaling $50,000, with nothing more than pro forma claims as to "countless" hours

---

[14] Other district court cases express concern over large disparities between the incentive award and the recovery of class members. (See *Alberto v. GMRI, Inc.* (2008) 252 F.R.D. 652, 669 [given a proposed $5,000 incentive award and an average $24.17 recovery, "and the utter lack of evidence demonstrating the quality of plaintiff's representative service, the court may be reticent to ultimately approve the parties' proposed settlement"; parties should "be prepared to present evidence of the named plaintiff's substantial efforts taken as class representative to justify the discrepancy between her award and those of the unnamed plaintiffs" (fn. omitted)].)

expended, "potential stigma" and "potential risk." Significantly more specificity, in the form of quantification of time and effort expended on the litigation, and in the form of reasoned explanation of financial or other risks incurred by the named plaintiffs, is required in order for the trial court to conclude that an enhancement was "necessary to induce [the named plaintiff] to participate in the suit . . . ." (*Continental Illinois, supra*, 962 F.2d at p. 571.)

### 3. *Costs.*

The trial court approved an award of costs totaling $44,574.27 ($26,199.27 as costs of litigation and $18,375 for claims administrator fees) from the $2 million settlement fund. However, the notice to class members of the proposed settlement stated that plaintiffs' counsel requested reimbursement "of costs of up to $40,000.00." Likewise, the stipulated class action settlement, which class members were invited to inspect, stated that class counsel would submit an application for an award of actual litigation costs "not to exceed Forty Thousand Dollars ($40,000), which includes the costs of claims administration," and that the amount stated would "constitute complete consideration for all . . . expenses incurred to date and for all . . . expenses to be incurred through the completion of the litigation and its settlement." Consequently, the trial court was not at liberty to award an amount exceeding $40,000 in costs without further notice to the class.

## CONCLUSION

The trial court approved the proposed class action settlement without a substantiated explanation of the manner in which a core legal issue was evaluated, and therefore lacked information sufficient to make its own informed evaluation of the fairness of the settlement. The court also lacked evidence sufficient to justify incentive awards to the named plaintiffs of the magnitude approved in this case, and awarded costs greater than the maximum amount specified in the notice given to the class. The order must therefore be vacated and the matter remanded for a redetermination of whether the settlement is fair and reasonable, based upon the court's receipt and consideration of sufficient information to make an independent assessment of the reasonableness of the settlement terms. We do not suggest that the proposed settlement may not ultimately be approved, and hold only that the trial court may not do so without information sufficient to assure itself that the settlement terms are in fact fair, adequate and reasonable.

## DISPOSITION

The order approving the class action settlement agreement and dismissing the case with prejudice is reversed and the matter is remanded for further proceedings consistent with this opinion. Appellants shall recover their costs on appeal, as a joint and several obligation of plaintiffs and defendants.

Rubin, Acting P. J., and Flier, J., concurred.