Hinkle, Margaret R., J.
This is an action for professional misconduct and breach of contractual obligations. Vermont Pure Holdings, Ltd. (“Vermont Pure”), alleges loss of a pre-suit settlement opportunity with Nestle Waters North America (“Nestle”) caused by attorney Kevin F. Beriy and his law firm, Cozen O’Connor (“the defendants”).[1]
On December 26,2008, the Court (Gants, J.) issued a Consolidated Memorandum of Decision and Order on Motions for Summary Judgment. In relevant part, the Court denied the summary judgment motion brought by the defendants as to Vermont Pure’s claims against them. The defendants had argued, among other things, that Vermont Pure could not sustain its burden of proving the required element of causation. They contended that the proposed (and ultimately lost) settlement between Nestle and its competitors, including Vermont Pure, was contingent upon judicial approval of a proposed consumer class action settlement, and that Vermont Pure could not establish that that proposed consumer class settlement would have been approved. Judge Gants observed that “the complex legal and factual issues involved in resolving whether Vermont Pure could prove causation precluded granting judgment as a matter of law; instead, those would require a full evidentiary hearing.”
The defendants subsequently moved for a pretrial evidentiary hearing. In allowing that motion, I concluded that a pretrial evidentiary hearing was warranted on the narrow question whether the proposed consumer class action settlement “would have been approved by a reasonable judge.”[2]
The Court held a jury-waived hearing on that question from October 1 through October 7, 2009. The parties presented their closing arguments on November 6, 2009.
Upon consideration of the credible testimony and documentary evidence introduced at the evidentiary hearing and application of the relevant law, the Court makes the following findings of fact and rulings of law.

Findings of Fact The California Class Action Settlement

1. On April 14, 1999, a class action case, Fields v. Great Spring Waters of America et al., No. 302774, (“Fields”), was filed in California Superior Court. The lead defendant was a predecessor of Nestle. The class action, consolidated with another class action, alleged, among other things, that the labeling and advertising of Calistoga Mountain Spring Water and Arrowhead Mountain Spring Water (both sold by Nestle) were false and misleading in that the products were not “spring water” as defined by California law and the U.S. Food and Drug Administration (the “FDA”).
2. On December 19, 2000, the Fields plaintiffs reached a settlement agreement with Nestle. In summary, the terms of the settlement were:
a. Nestle would make charitable donations of $950,000 a year for five years “in money or in kind” (i.e., potentially in the form of water) to charitable organizations of its choice among three categories of organizations.
b. Nestle would issue product discount coupons and/or free water with a face value of $1 million a year for five years to consumers of the Calistoga and Arrowhead brands, with a redemption value “floor” (i.e., the amount of actual redemptions below which *34 Nestle would have to make additional charitable contributions) of $225,000 per year, for a cumulative redemption floor of $1.1 million.
c. Nestle would be subject to a monitoring program, which included monitoring of turbidity levels and dissolved solids at five bottling plants at various spring sites and agreeing to reject water that failed to meet specified criteria; microscopic particulate analysis at various spring sites and agreeing to reject water that failed to meet specified criteria; sharing of data with class counsel; and a dispute resolution procedure.
d. The parties stipulated that the Calistoga and Arrowhead brands were “spring water" and could be so labeled.
3. On April 13, 2001, the Court issued a final order which certified the plaintiff class, gave final approval of the settlement and approved payment of $1.88 million in attorneys fees to class counsel.

The 2003 Mediation

4. In the summer of 2002, Attorney Jan Schlichtmann began discussing with other attorneys the possibility of asserting potential claims against Nestle involving Poland Spring water through a consumer class action. In November 2002, Attorney Garve Ivey suggested to Schlichtmann broadening the claims against Nestle to include competitor claims for unfair competition under the Lanham Act. By late 2002, Schlichtmann, Ivey and Thomas Sobol (of the law firm of Hagens Berman Sobol Shapiro LLC) (the “Lead Counsel Group”) agreed to pursue claims against Nestle for misrepresenting the source, nature and quality of Poland Spring water. All three lawyers were experienced in litigating consumer class actions.
5. Schlichtmann, Sobol and Ivey recognized that a class action on behalf of Nestle’s retail store consumers (as opposed to its home and office delivery customers) would be difficult because the class members could not be identified, and what retail consumers would have paid if the water sold by Nestle had not been labeled as “spring” water could not be measured.
6. Schlichtmann and Ivey believed that the Lanham Act claims would provide a stronger basis for negotiation with Nestle than consumer class claims because competitors could raise disgorgement of profits as a potential remedy.
7. The three attorneys began developing claims against Nestle with the understanding that they would seek competitor claimants as clients.
8. Sobol and Ivey agreed to Schlichtmanris suggestion that Lori Ehrlich be individual consumer client and putative class representative. The lawyers signed agreements to represent Ehrlich on March 11, 2003. Ehrlich was a home and office customer of Poland Spring and a retail purchaser. She was a Certified Public Accountant and graduate of the Kennedy School, where she obtained a Masters in Public Administration. As of 2002, she had founded and directed several non-profit environmental advocacy groups, had negotiated with the Massachusetts Department of Environmental Protection, had participated in formal rule-making, and had become involved with issues relating to hydrology analysis. In addition, she had served as a mediator for the Massachusetts Attorney General’s Office on environmental matters.
9. Ehrlich believed that the primary interest of the class was obtaining injunctive relief to ensure that Poland Spring water was safe, clean and appropriately sourced. For her, monetary relief or recovery of coupons was secondary. To the extent monetary relief was obtained for potential consumer classes, Ehrlich believed that the different characteristics of the two consumer groups dictated different relief. Because home and office customers were easily identifiable and demonstrably loyal to the Poland Spring brand based on their monthly purchases, Ehrlich believed they should receive a direct credit on invoices or a cash payment. Because retail consumers were difficult to identify and not necessarily loyal to any particular brand, Ehrlich believed that indirect benefit in the form of charitable contributions rather than coupons could be an appropriate type of relief. Ehrlich’s testimony on these points was credible and persuasive.
10. At Schlichtmanris suggestion, the Lead Counsel Group decided to attempt to mediate their claims against Nestle before initiating litigation. Rodney Max was selected as mediator, and he approached Nestle. On February 28, 2003, mediation sessions with Nestle began. Over the next four months, mediations occurred in Boston, Connecticut and New Jersey.
11. In late March 2003, Sobol, Schlichtmann and Ivey asked attorney Max Stern to become involved with the consumer claims. Stem understood that he was retained as counsel for the class, while Ehrlich understood Stern to be representing her individually.
12. The Lead Counsel Group invited several companies that sold bottled water in New England to retain them on a contingent fee basis. Four companies eventually retained them: Glenwood Farms, Inc. (“Glen-wood Farms”), Carrabassett Spring Company (“Carrabassett”), Tear of the Clouds, LLC (“Tear of the Clouds” also known as “Keeper Springs”) and Vermont Pure. The contingent fee percentages in the fee agreements were 33 1/3 per cent for Glenwood Farms and Tear of the Clouds and 40 per cent for the other clients.
13. On April 21, 2003, Sobol wrote Nestle on behalf of the consumer claimants demanding a settlement payment of $65 million and various forms of injunctive relief. The letter stated: “To the extent that this dialogue [regarding injunctive relief] achieves a truly meaningful change of sourcing and/or labeling, doing so creates even greater flexibility as to all aspects, including the monetary provisions of our proposed settlement.”
*35 14. Sobol also wrote Nestle on behalf of Keeper Springs, Glenwood Farms and Vermont Pure demanding a settlement payment of $150 million. On May 16, 2003, Ivey wrote a letter on behalf of Carrabassett, demanding a settlement payment of $47 million. As of May 16, 2003, the total demand on behalf of the four competitor clients was $197 million.
15. Nestle’s representatives told Sobol,. Ivey and Schlichtmann that if consumer class actions were filed and attendant publicity occurred, Nestle would no longer be interested in negotiating settlement of any claims. Nestle was concerned with the adverse publicity which might result from consumer claims.
16. By the end of May 2003, Sobol, Ivey and Stem strongly opposed the direction of the settlement discussions. They felt that Schlichtmann was advancing competitor claims at the expense of the consumer class. In the midst of the rancor, Schlichtmann even suggested abandoning the consumer claims.
17. Ehrlich received regular telephone updates from both Schlichtmann and Stern during this time. From those calls, Ehrlich concluded that Stern was thwarting settlement of the class claims, so she fired him. After a June 2, 2003, conference call, she rehired Stern after he, Sobol and Ivey agreed to allow Schlichtmann to make another attempt at negotiating settlement of the class claims.
18. This occurred on June 4, 2003, when Schlichtmann, Stern, Ivey, Jeniene Andrews-Matthews (an associate of Sobol) and Nestle representatives attended a mediation in New Jersey. Although Ehrlich did not attend, she received regular phone updates from both Schlichtmann and Stern. During the afternoon of June 4, 2003, based on information from Schlichtmann, Ehrlich concluded that Stem, Sobol’s associate and Ivey were hindering settlement negotiations, so she terminated them, and they left the mediation.
19. Schlichtmann then obtained authorization from Ehrlich and the competitor claimants to continue negotiations with Nestle with him simultaneously representing the consumer class and the competitors. Negotiations continued throughout the late afternoon and evening, resulting in what is known as the “Wednesday Night Deal.”
20. As they pertained to the consumer class, the Wednesday Night Deal terms were:
a. Nestle would pay $2.5 million to members of the “home and office” consumer class, either in the form of cash payments or discounted monthly invoices.
b. Nestle would make $2.5 million in total payments to charitable organizations designated by Ehrlich. These organizations would be dedicated to safe drinking water and/or a clean environment, subject to final sign-off by Nestle.
c. Nestle would agree to a monitoring program to ensure the integrity of its spring water sources. (The specifics of the program were to be worked out.)
d. Nestle would agree to a pumping volume limit at its Poland Spring site sufficient to prevent infiltration “akin” to monitoring commitments made by Nestle in the Fields case described above.
e. Schlichtmann would seek no fee in connection with the consumer class settlement, but would locate separate independent counsel for the class who would investigate the claims, continue negotiation with Nestle and seek a reasonable fee.[3]
21. Under the Wednesday Night Deal, Nestle would settle the four competitor claims by: (i) paying $20 million to be allocated among the companies and their lawyers, with the Lead Counsel Group expected to receive approximately $9 million as their contingent fees; (ii) enter into “take or pay” contracts with Glen-wood Farms and Carrabassett where Nestle would purchase $4.5 million of water from each company over lOyears; and(iii)makea$l million cash donation to Keeper Springs or its designee.
22. Ehrlich approved settling the class action consistent with the Wednesday Night Deal. On these terms, Nestle’s counsel, Jeffrey Garrod, believed court approval of the class action portion of the settlement was likely, based on his knowledge and considerable experience with similar litigation.
23. On June 16, 2003, Nestle formally conveyed to the mediator that it accepted the Wednesday Night Deal terms.
24. On June 18, 2003, Sobol telephoned Stanley Schwartz, another Nestle attorney and a partner of Garrod. Sobol told Schwartz that he and Ivey objected to the consumer class terms and intended to authorize publication by CBS and other media outlets of information likely to generate negative publicity about Poland Spring water unless Nestle immediately made a more generous settlement offer. Sobol proposed that Nestle make a $30 million cash payment, from which attorneys fees would be deducted. Nestle refused Sobol’s proposal. That same day, Sobol filed the first of several class actions.
25. If the Wednesday Night Deal had proceeded, counsel for Nestle planned to seek approval of the consumer class settlement in a jurisdiction that allowed for certification of national class actions to obtain a release from a nationwide class. Massachusetts is not such a state.

The Subsequent ttlinois Class Action Settlement

26. Soon after June 18, 2003, at Schlichtmann’s suggestion, Illinois Attorney Robert Foote agreed to represent the consumer class. Schlichtmann provided Foote with case materials from his files.
27. Although Schlichtmann testified he was not otherwise involved in the subsequent Illinois class *36 proceeding, Ramsey v. Poland Spring Water Co. & Nestle Waters N. America, No. 03-CHK-817 {“Ramsey”), I do not entirely credit that testimony. During pendency of Ramsey, Schlichtmann and Nestle periodically met or communicated concerning Glenwood Farms and Carrabassett under the auspices of a mediation in which Rod Max served as mediator. Those negotiations never progressed to resolution during pendency of Ramsey.
28. On July 24, 2003, a mediation session with Nestle was held, at which Foote and a co-counsel represented the putative class. Schlichtmann was present in the building where the mediation occurred, but he says that he did not participate in it. The parties used the settlement agreement from the Fields case as a starting point for negotiation of terms relating to coupon face value, redemption rates, charitable contributions and monitoring. Multiple offers were exchanged, and key financial terms were tentatively agreed upon, subject to matters still to be negotiated and to investigation of the merits of the claims by class counsel.
29. On July 29, 2003, Foote filed the Ramsey consumer class action in Kane County, Illinois. The case was assigned to Judge Michael J. Colwell. Thereafter, Sobol and Stern moved for recusal of Judge Colwell, based on his alleged past connections with Foote, and the class representative, Kenneth Ramsey, the local sheriff. This motion was heard by another judge and denied.
30. Foote and his co-counsel, Kathleen Chavez, subsequently conducted site inspections at four Maine facilities over three days, site visits and employee interviews at Nestle’s Home and Office facility in Massachusetts and its national headquarters in Connecticut, interviews and depositions of Nestle executives with authority over relevant spring water sites, marketing executives, outside hydrology experts and settlement valuation experts. Counsel also reviewed reports and opinions and studies of hydrology and settlement valuation experts and more than 115 boxes of documents containing reports of Nestle’s spring water sources, including engineering and hydrology data, test results and correspondence with state and federal regulators.
31. On August 20, 2003, Foote and Nestle entered into a settlement subject to court approval. In sum, the terms of the settlement were:
a. Nestle would make charitable donations in the amount of $2.75 million over five years “in money or in kind.” The recipients of 25 per cent of the donations would be designated by the plaintiff, and the remainder by Nestle.
b. Nestle would issue product discounts (coupons) to consumers totaling $8.05 million over five years, with a redemption floor of $400,000 per year, for a cumulative redemption floor of $2 million. At least 10 per cent of these discounts had to be provided to retail consumers, while no minimum was set for home and office customers.
c. Although Nestle would continue to label its product as “spring water,” it could not extract more than 350 million gallons of water a year from its Poland Spring site. (This amount was less than Nestle was then permitted to pump from that site.)
d. Nestle agreed to a five-year period of monitoring above the requirements of state and federal law, including monitoring water turbidity by source site and plant and rejection of water that failed to meet specified criteria, and Nestle also agreed to perform microscopic particulate analysis at each of its source sites and to reject water that failed to meet specified criteria, to share data with class counsel, establish a dispute resolution procedure.
32. During the settlement approval process, the parties submitted affidavits to Judge Colwell from five hydrologists regarding whether water from various Nestle sites met the FDA definition of “spring water,” and whether the suggested long-term monitoring program conveyed a substantial benefit to the class by ensuring the health and quality of Poland Spring water.
33. During the settlement approval process, Sobol and Stern brought to Judge Colwell’s attention the fact that earlier consumer class negotiations with Nestle had occurred as part of a discussion which also involved settlement of competitor claims and that Schlichtmann had been simultaneously involved in both negotiations and might receive a substantial fee from resolution of the competitor claims.
34. On or about October 20, 2003, Judge Colwell issued a Final Judgment and Order of Dismissal, which certified the plaintiff class, approved the terms of the settlement as fair and reasonable, and approved payment of fees to class counsel of $950,000. Among Judge Colwell’s findings was a determination that “the likelihood of success on the merits of the class claims is weak based on the facts and evidence adduced through formal and informal discovery.”
35. Judge Colwell concluded that there were “significant risks” related to the calculation and establishment of damages, such as the “price differential between ‘spring water’ and alternative bottled water products, the motivating factors driving selection of bottled water products and the incremental value of any alleged deception.” Judge Colwell stated that the class would face “serious challenges” in establishing actual damages.
36. As to the coupon relief, Judge Colwell concluded that coupons/discounts were “an appropriate and acceptable” form of relief in a class action.
37. After approval of the Ramsey settlement, Sobol (on behalf of a lawyer group that also included Ivey, Stern and their firms) and others filed appeals on behalf of their clients, who included objectors in *37 Ramsey and representatives of consumer classes in related actions pending in other courts across the country.
38. Sobol eventually agreed to drop the appeals after Schlichtmann agreed to release any potential claims to the fee that Sobol and Ivey stood to obtain from the post -Ramsey settlement. Foote and Garrod negotiated with Schlichtmann over the release. Schlichtmann would not provide a release unless Nestle agreed to reimburse him for his expenses and agreed to a recovery for his clients, Glenwood Farms and Carrabassett. Ultimately, Nestle paid Schlichtmann $1.7 million, a substantial portion of which went to Schlichtmann in the form of fees, and Schlichtmann executed a mutual release with Sobol and Ivey.
39. Pursuant to a subsequent settlement agreement, all appeals of the Ramsey settlement and related claims against Nestle in other jurisdictions were voluntarily dismissed or otherwise released. In exchange, Nestle agreed to:
a. Pay each objector and class representative $1,000;
b. Use its best efforts to issue coupons for nine brands of bottled water in sufficient quantities to achieve a redemption value of $5 million per year up to a cumulative total of $25 million within 5 years or, failing that, make charitable contributions for the difference; and
c. Pay $2.65 million in attorneys fees, $2.03 million of which was allocated to a group including Sobol, Ivey, Stem and their firms.
40. Under this settlement agreement, Nestle had sole discretion as to the issuance of coupons for any of nine different brands. These coupons were separate from any other marketing or coupon program that Nestle was implementing or planning to implement. At the time it entered into the post-Ramsey settlement agreement, Nestle’s existing coupon programs were of greater scope than what was required by the agreement. Nestle reached and surpassed the $25 million issued coupon threshold before the end of the third year of the five-year program set forth in the agreement.
41. Beyond the $1,000 payments to Ramsey objectors and other class representatives, the post-Ramsey settlement provided no additional injunctive relief, monitoring or enforcement, cash payment, or other benefit to any member of the various consumer classes whose actions were dismissed as a result. That settlement does not appear to have been approved by any of the courts presiding over those other cases.
Merits of Class Claims Against Nestle
42. At all relevant times, each source Nestle used for its Poland Spring water was specifically permitted as a “spring water” site by appropriate regulatory authorities in Maine.
43. Various states license Poland Spring water for sale as “spring water” under their regulatory framework. No state has determined that Poland Spring water should be denied such a license.
44. No court or state or federal administrative agency has found that Poland Spring water fails to satisfy a state or federal definition of “spring water” or that Nestle cannot appropriately label Poland Spring water as “spring water.”
45. In the only instance in which a state licensing authority indicated a preliminary disapproval of labeling of Poland Spring water for sale as “spring water,” litigation resulted in a final judgment for Nestle. Georgia Crown Distrib. Co. & Poland Spring Corp. v. Georgia Dep’t of Agric., Georgia Superior Court (Muscogee County) No. 92 CV 3616. The Georgia state definition of spring water was broadly similar to what ultimately became the federal regulatory standard in that it required that water be “derived from an underground formation from which water flows naturally to the surface of the earth,” and that water could be “collected only at the spring or through a borehole into the same underground water-bearing zone; provided, however, water collected with the assistance of external force to protect the water shall retain all the physical properties of and be of the same chemical composition and quality as the water that flows naturally to the surface.”
46. The stipulated final judgment in the Georgia litigation concluded that “Poland Spring brand bottled water extracted from its new production bore holes may be labeled as ‘spring water’ for sale in Georgia.”
47. The study which persuaded the Georgia Department of Agriculture to agree to the stipulated final judgment was entitled “Hydrogeologic Investigation of the Glacial Aquifer at Poland Spring Corporation and its Relationship to Subaqueous Springs, conducted by P.E. LaMoreaux & Associates, Inc., (“LaMoreaux”) and dated February 12, 1993. It concluded that (1) sub-aqueous spring flow is present in Lower Range Pond near the Poland Spring production boreholes; (2) water drawn from the Poland Spring boreholes is from the same water-bearing stratum that supplies spring discharge; and (3) water from the boreholes is of the same physical character and chemical composition as that emanating naturally as spring flow.
48. The LaMoreaux study was submitted to the Maine Department of Conservation. A February 18, 1993, letter from the Department indicates that professionals in its Hydrogeology Division gave the study a “thorough peer review.” According to the letter, “(t]he report succinctly and conclusively demonstrates in its findings the presence of spring discharge at the site in Lower Range Pond. It clearly reveals the direct hydraulic connection between the springs and the production borehole waters, and the chemical and physical equivalency of the waters.”
*38 49. Since 1995, the FDA has defined “spring” water as “water derived from an underground formation from which water flows naturally to the surface of the earth” which is “collected only at the spring through a bore hole tapping the underground formation feeding the spring” through “a natural force causing the water to flow to the surface through a natural orifice.” Like the Georgia definition, the FDA further permits using an external force: “water collected with the use of an external force shall be from the same underground stratum as the spring . . . and shall have all the physical properties, before treatment, and be of the same composition and quality, as the water that flows naturally to the surface of the earth” and water “must continue to flow naturally to the surface of the earth through the spring’s natural orifice.”
50. A January 6, 1999, letter from the Maine Department of Human Services states that “(i]t is the Department of Human Services opinion that water withdrawn from this borehole [# 1] is in fact water intercepted on its way to the subaqueous vents located in Lower Range Pond.”
51. A May 19, 1999, letter from the Maine Department of Human Services states that (1) a thermal image of the vents in Lower Range Pond “clearly shows the subaqueous springs venting into the pond” and (2) that the Department is of the opinion that “water withdrawn from this borehole [# 10] is in fact spring water intercepted on its way to the subaqueous spring vents located in Lower Range Pond.”
52. In 1998, Nestle hired the Atlantic Geoscience Corporation of Guilford, New Hampshire (“AGC”) to study the Poland Spring sources in response to a request from the California Department of Health Services. Using thermal imaging taken in Spring 1997 and comparing the geochemical signatures of samples of water, AGC concluded that water from replacement Boreholes Nos. 2, 3 and 5 was drawing “spring water.” The California Department of Health Services, relying on this information and consulting with the Maine regulators, concluded that the water could be labeled “spring water.”
53. Massachusetts has regularly licensed Poland Spring water for sale in the Commonwealth, after requesting and reviewing extensive data concerning water sources.
54. At all relevant times, Nestle had in place a plan, approved by the State of Maine, to monitor the ground water quantity in the Poland Spring aquifer. Nestle submitted a monitoring plan on October 2, 1990, that the Maine Bureau of Land Control commented was “of exceptional quality and will, when implemented, provide adequate protection against overuse of the aquifer under conditions of extended drought.” Nestle submitted a revised plan in April 1992 and an addendum in August 1999, both of which were accepted by Maine. Among other things, the plans required Nestle to notify the Maine Department of Environmental Protection if water table levels diminish below a certain level, and to implement procedures to reduce withdrawal rates. There is no evidence in the record that Nestle failed to implement or comply with its ground water monitoring program, which, according to Maine, authorities would protect against overuse of the aquifer.
55. As noted, under the Ramsey settlement agreement, Nestle agreed to extract from its Poland Spring facility no more than 350 million gallons per year for five years. This amount was less than the amount set forth in the permit issued by Maine regulators.
56. Research conducted on behalf of the claimants in April 2003 concluded that most purchasers of bottled water (59.4 per cent) did not take any “special care to make sure it is spring water.”
57. Nestle added three sites to its original Poland Spring site between the years 1996 and 2002. Each of these sites is permitted as a “spring water” site by the Maine regulators. As early as 2000, Nestle prepared labels for its retail bottles which indicated multiple spring sources for its water. When Nestle began using other spring sources, it notified home and office customers in writing and notified retail customers through labels.

Rulings of Law

Vermont Pure bears the burden to prove, among other things, that the legal malpractice alleged here was the proximate cause of its loss. See, e.g., Colucci v. Rosen, Goldberg, Slavet, Levenson & Wekstein, P.C., 25 Mass.App.Ct. 107, 111 (1987), citing McLellan v. Fuller, 226 Mass. 374, 378 (1917), and Nolan, Tort Law §185 (1979); Frullo v. Landenberger, 61 Mass.App.Ct. 814, 817 (2004). Although “(g]enerally, the issue of proximate cause is one of fact for the jury,” Girardi v. Gabriel, 38 Mass.App.Ct. 553, 558 (1995), citing Mullins v. Pine Manor College, 389 Mass. 47, 58 (1983), it is appropriate for the Court without ajuiy to carve out and resolve the aspect of the causation issue that requires determination whether the proposed consumer class action settlement would have been approved, see generally, e.g., 4 Newberg on Class Actions §11:41 (4th ed. 2002) (class action settlement approval determined by judge); 2 McLaughlin on Class Actions §6:4 (6th ed. 2010) (same).
Because criteria pertinent to determining whether that settlement would have been approved are not, in the usual course, jurisdiction specific, see, e.g., 4 Newberg on Class Actions §11:43 (class action settlement general criteria) and see, e.g., id., §13:68 (factors identified for state court approval of class settlement); see generally A.P. Wheeler, ABA Survey of State Class Action Law (2006), the question whether the proposed settlement at issue here would have been approved aptly may be viewed through the lens of “a reasonable judge.” The evidentiary hearing, as contemplated by Judge Gants, was accordingly held pretrial to determine the narrow question whether a reasonable judge *39 would have approved the proposed consumer class action settlement.[4]
Approval of a class action settlement which binds absent class members requires determining that the settlement is “fair, reasonable, and adequate.” See, e.g., 4 Newberg on Class Actions §11:41 (reviewing cases applying Fed.RCiv.P. 23[e]); 2 McLaughlin on Class Actions §6:7 (same). “The criteria generally utilized in determining whether a settlement is fair, reasonable, and adequate are: 1. likelihood of recovery, or likelihood of success; 2. amount and nature of discovery or evidence; 3. settlement terms and conditions; 4. recommendation and experience of counsel; 5. future expense and likely duration of litigation; 6. recommendation of neutral parties, if any; 7. number of objectors and nature of objections; and 8. the presence of good faith and the absence of collusion.” 4 Newberg on Class Actions §11:43; see generally id., §§11:44-11:51 (detailing criteria).[5]
Courts often place the greatest significance on the first factor, balancing the strength of the plaintiffs’ case on the merits against the amount offered in settlement, see, e.g., West Virginia v. Charles Pfizer & Co., 440 F.2d 1079, 1085 (2d Cir.1971); Clark v. American Residential Servs. LLC, 175 Cal.App. 4th 785, 799 (2009), quoting Kullar v. Foot Locker Retail, Inc., 168 Cal.App.4th 116, 130 (2008), but there is “considerable discretion whether to approve a particular settlement,” and, thus, “the court need not give greater weight to any particular relevant factor and is not required to consider all factors,” 2 Moore’s Manual: Federal Practice and Procedure §14A.93[1] (2009); see also 2 McLaughlin on Class Actions §6:7 (settlement approval factors used by courts “are a guide; an unfavorable conclusion regarding one or more factors does not automatically render the settlement unfair”); Manual for Complex Litigation, Fourth, §21.62 (setting out common considerations for determining weight accorded to various settlement approval factors).[6]
“All settlements spare the judicial system and the litigants the expense and time associated with the full panoply of pretrial, trial and posttrial proceedings. Courts have consistently noted that the public interest favoring the settlement of litigation is even stronger in the context of class action litigation, where one proceeding can resolve many thousands or even millions of claims that might otherwise threaten to swamp the judiciary. 2 McLaughlin on Class Actions §6:3; see also 4 Newberg on Class Actions §13:63 (rule that the law favors settlements “has particular force in class actions”). ’’Thus in considering a proposed class settlement, courts generally view facts in a light favorable to settlement. The court must still consider, however, the nature of the plaintiffs claim, possible defenses thereto, legal and factual circumstances of [the] case, and then apply its judgment in deciding whether settlement is reasonable in light of those factors." 4 Newberg on Class Actions §13:63.
In this case, Vermont Pure’s burden to establish that the proposed consumer class settlement would have been approved is largely satisfied by the evidence pertaining to the settlements approved in the similar Fields and Ramsey actions. Especially given that the Ramsey litigation essentially picked up where the contemplated class action with Ehrlich as representative left off, the Final Judgment and Order of Dismissal entered in Ramsey, standing alone, provides substantial evidence that a reasonable judge would have approved the proposed consumer settlement at issue here.
Significantly, written findings supporting Judge Colwell’s approval of the Ramsey settlement accord with credible evidence offered at the hearing in this matter to establish the low likelihood of successful recovery on the proposed consumer class action.[7] The weight of the credible evidence introduced at the evi-dentiary hearing demonstrates that those class claims were not strong, that the underlying theory of damages was problematic at best, and that the prosecution to a judgment on the merits of what would have been relatively complex litigation would have been risky and costly.
Balanced against the palpable weakness in the merits of the proposed consumer class action claims, the terms negotiated by Schlichtmann on June 4, 2003, conferred a sufficient benefit on the contemplated class to have reasonably withstood judicial scrutiny. Nestle had agreed to pay $2.5 million in cash or discounts to members of the home and office consumer class and an additional $2.5 million in total payments to charitable organizations.[8] Nestle also had agreed to a monitoring program to ensure the integrity of its spring water sources and to a pumping volume limit at its Poland Spring site sufficient to prevent infiltration. To be sure, the proposed monetary settlement terms were not as favorable as those obtained in the Fields action, and Nestle was shown through the Ramsey litigation and post-Ramsey settlement to be willing to offer greater concessions.[9] But the settlement negotiated by Schlichtmann with Nestle was, on the whole, within relatively close range of those approved settlements, both in the amount offered and in the form of relief. At bottom, the proposed settlement “secure[d] an adequate advantage,” 4 Newberg on Class Actions §11:46, when balanced against the relatively meager litigation rights surrendered against Nestle. See 2 McLaughlin on Class Actions §6:15 (“In making a determination whether a proposed settlement is substantively fair to class members, courts evaluate whether the consideration provided to class members is within a range of reasonableness based on an estimation of the value of what is to be released in the settlement”).
In sum, this Court concludes that the settlement negotiated by Schlichtmann on June 4, 2003, while not substantial, was objectively fair, reasonable and *40 adequate, such that a reasonable judge would have approved it.

ORDER

For the foregoing reasons, Vermont Pure Holdings, Ltd., has established by a preponderance of the evidence that a reasonable judge, with knowledge of the relevant facts and the governing law, would have concluded that the settlement negotiated for the consumer class on June 4, 2003, was fair, reasonable and adequate.

 The Court presumes some familiarity with its December 26, 2008, and July 10, 2009, summary judgment decisions. Background facts apparent at an earlier stage in the litigation are also recounted in Ehrlich v. Stern, 74 Mass.App.Ct. 531, 532-34 (2009). Related litigation has unfolded in Glenwood Farms, Inc. v. Ivey, Docket No. 03-cv-217-P-S (D.Me.), and Glenwood Farms, Inc. v. Cozen O’Connor, Docket No. 09-cv-205-P-S (D.Me.).

 My mling effectively resolved two of the issues identified by Judge Gants as complicating the question of causation: (i) “whether the court or the jury should decide whether the proposed settlement would have been approved by the court” and (ii) “what is the issue being decided” (emphasis removed).

 While Schlichtmann’s dual role at the June 4 negotiation was fraught with conflict, I credit his testimony as to obtaining independent successor counsel for the consumer class before litigation commenced. I also credit his testimony that any judge asked to approve the Wednesday Night Deal would have been informed that he had represented both the competitors and the consumer class at the mediations. I am also mindful that both the competitor claimants and Ehrlich consented to his dual representation during the June 4 negotiation.

 On the threshold dispute between the parties, the Court agrees in principle with Vermont Pure that any uncertainty remaining as to the precise terms of the Wednesday Night Deal should not operate to bar recovery where that indefiniteness is fairly seen as the consequence of the defendants’ alleged interference with the settlement discussions. See Jernigan v. Giard, 398 Mass. 721, 723 (1986) (stating general principle that “an attorney defending a malpractice action may not rely on the consequences of his own negligence to bar recovery against him”). In any event, those terms are sufficiently definite to permit resolution of the discrete issue currently before the Court.

 Federal courts have developed variations on these general criteria, see, e.g., Wal-Mart Stores, Inc., v. Visa U.S.A, Inc., 396 F.3d 96, 117 (2d Cir. 2005); In re Insurance Brokerage Antitrust Litig., 579 F.3d 241, 258 (3d. Cir. 2009); see generally 4 Newberg on Class Actions §11:43 (4th ed. 2002); 2 McLaughlin on Class Actions §6:7 (6th ed. 2010); Manual for Complex Litigation, Fourth, §21.62; 2 Moore’s Manual: Federal Practice and Procedure §14A. 93[2][a]-[d] (2009), as have state courts, which frequently draw on federal class action decisional law, see, e.g., State v. Buckley Powder Co., 945 P.2d 841, 844 (Colo. 1997); Weiss v. State, 939 P.2d 380, 386-87 (Alaska 1997); General Motors Corp. v. Bloyed, 916 S.W.2d 949, 955 (Tex. 1996); Nottingham Partners v. Dana, 564 A.2d 1089, 1094 (Del. 1989); see generally 4 Newberg on Class Actions c. 13 (Class Actions in State Courts).

 The Court has not overlooked that, even where a class action is filed only for purposes of settlement, as apparently was contemplated for the action against Nestle after the Wednesday Night Deal, class certification prerequisites must be met. See, e.g., Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 613-14, 620-21 (1997); see also Manual for Complex Litigation, Fourth, §§21.132 & 22.921; see generally 2 McLaughlin on Class Actions §6:3 (6th ed. 2010). There is no dispute that the proposed class action would have met the numerosily, commonality and typicality requirements of, e.g., Fed.R.Civ.P. 23(a)(l)-(3), and the predominance and superiority requirements of, e.g., Fed.R.Civ.P. 23(b)(3). The defendants’ contention that there was inadequate representation, see, e.g., Fed.R.Civ.P. 23(a)(4), because Schlichtmann simultaneously negotiated the competitor and consumer settlements is unavailing in light of my finding that successor counsel would have been retained to represent the consumer class and independently review the proposed consumer class settlement and the fact that Ehrlich knew and approved of Schlichtmann’s dual role. The same factual findings also sufficiently dispel the inference of collusion between Schlichtmann and Nestle that the defendants urge be drawn.

 Judge Colwell expressly evaluated the Ramsey settlement in terms of the factors articulated in Chicago v. Korshak, 206 Ill.App.3d 968, 971-72 (1991), citing Armstrong v. Board of Sch. Directors, 616 F.2d 305, 314 (7th Cir. 1980) (“[1] the strength of the case for plaintiffs on the merits, balanced against the money or other relief offered in settlement; [2] the defendant’s ability to pay; [3] the complexity, length and expense of further litigation; [4] the amount of opposition to the settlement; [5] the presence of collusion in reaching a settlement; [6] the reaction of members of the class to the settlement; [7] the opinion of competent counsel; [8] the stage of proceedings and the amount of discovery completed”).
It may reasonably be inferred that the California judge approving the Fields settlement engaged in a similar analysis. See, e.g., Clark v. American Residential Servs. LLC, 175 Cal.App.4th 785, 799-800 (2009), quoting Dunk v. Ford Motor Co., 48 Cal.App.4th 1794, 1801 (1996) (“The trial court must determine whether a class action settlement is fair and reasonable, and has broad discretion to do so. That discretion is to be exercised through the application of several well-recognized factors ... which include [ I ‘the strength of plaintiffs’ case, the risk, expense, complexity and likely duration of further litigation, the risk of maintaining class action status through trial, the amount offered in settlement, the extent of discovery completed and the stage of the proceedings, the experience and views of counsel, the presence of a governmental participant, and the reaction of the class members to the proposed settlement’ ”).

 The Court is not persuaded by the defendants’ argument that cy pres relief was inappropriate under the facts of this case.
“Although cy pres distributions (also known as fluid recoveries) in class actions received early criticism, that criticism has diminished considerably. Such distributions, including the entire amount of the consumer settlement fund rather than just the residue, are being used or advocated increasingly where direct distribution of settlement funds to individual class members is impractical; and where important consumer goals, such as disgorgement of ill-gotten gains from and deterrence of future over-pricing and manipulation of market allocation by the offending entities, can be achieved.” (Citation omitted.) Boyle v. Giral, 820 A.2d 561, 569 (D.C. 2003); see generally 4 Newberg on Class Actions §11:20 (4th ed. 2002); 2 McLaughlin on Class Actions §8:15 (6th ed. 2010); National Ass’n of Consumer Advocates, Standards & Guidelines for Litigating & Settling Consumer Class Actions (2d ed. 2006), 255 F.R.D. 215, at 31-34 (2009).

 "The essence of a settlement is compromise. Accordingly, it is hardly surprising that it often may be said that a solvent defendant would be able to withstand a judgment in excess of the amount it agrees to pay to consensually resolve class action litigation. Accordingly, the defendants’ ability to withstand a greater judgment, by itself, does not suggest that the settlement is unfair.” (Footnotes omitted.) 2 McLaughlin on Class Actions §6:14 (6th ed. 2010).