PER CURIAM.
In these consolidated appeals, Carol M. Perdue, individually and as next friend and guardian of her daughter, Anna K. Perdue; William D. Motlow, Jr.; and Shane Sears (hereinafter collectively referred to as “the objectors”), all of whom are objecting class members in class-action litigation related to the Alabama Prepaid Affordable College Tuition (“PACT”) Trust Fund a/k/a The Wallace-Folsom Prepaid College Tuition Trust Fund, appeal the trial court’s judgment approving a class-action settlement concluding the litigation.[1] We vacate the trial court’s judgment and remand the case.

Facts and Procedural History

This Court, in Ex parte Callan Associates, Inc., 87 So.3d 1161 (Ala.2011), explained the pertinent history of the PACT program, as it led to the underlying class-action litigation and to other litigation, as follows:
“In 1990, the Alabama Legislature established the Alabama Prepaid Affordable College Tuition (‘PACT’) program as part of the Wallace-Folsom College Savings Investment Plan, see §§ 16-33C-1 to 8, Ala.Code 1975. As explained by the Court of Civil Appeals in Johnson v. Taylor, 770 So.2d 1103 (Ala.Civ.App.
*349 1999), the purpose of the PACT program is
“ ‘to assist payment of college tuition costs by allowing a person to purchase PACT contracts in advance of a child’s attending college. The PACT program obligates the state to pay tuition in accordance with the contract if the minor child attends a state college or university. § 16-33C-1. The purchase price of a PACT contract is determined actuarially. § 16-33C-6(f). Payments received become public funds, which the state invests to generate assets to fund the child’s education. § 16-33C-6(d).’
“770 So.2d at 1104.
“Pursuant to the statutory scheme, the PACT program is overseen by a ‘PACT board,’ which serves as both ‘[t]he board of directors and trustees of the PACT Trust Fund.’ § 16-33C-3(14), Ala.Code 1975. Also pursuant to statute, the members of the PACT board are specifically empowered ‘[t]o invest as [the board] deems appropriate any funds in the PACT Trust Fund.... ’ § 16-33C-5(3), Ala.Code 1975. In fulfilling that responsibility, including decisions relating to ‘acquiring, investing, reinvesting, exchanging, retaining, selling, and managing property of the PACT Trust Fund,’ both ‘the PACT board and any person or investment manager to whom the PACT board delegates any of its investment authority’ is charged with ‘exercising] the judgment and care under the circumstances then prevailing which persons of prudence, discretion, and intelligence exercise in the management of their own affairs, not in regard to speculation but to permanent disposition of funds, considering the probable income as well as the safety of their capital.’ § 16-33C-6(d), Ala. Code 1975.
[[Image here]]
“On February 27, 2009, Kay Ivey, then state treasurer and, by virtue of that office, chairman of the PACT board, issued a letter to the purchasers (holders) of PACT contracts informing them that a downturn in the stock market had negatively impacted the assets of the PACT Trust Fund but indicating that the PACT board remained committed to honoring the PACT contracts and that the PACT board was investigating options and exploring opportunities that would ‘allow PACT benefits to be consistently paid.’ ”
87 So.3d at 1162-64 (footnote omitted).
In response to then State Treasurer Ivey’s disclosure, several lawsuits were filed against the PACT board, including a class-action complaint filed in March 2009 in the Montgomery Circuit Court (case no. CV-09-900351) by Lisa Nix Green, individually and as next friend of Brent A. Green and Blake A. Green. In that action, Green, purporting to represent a class consisting of those who had purchased a PACT contract before 1995, alleged breach of contract and a violation of 42 U.S.C. § 1983. The action sought a judgment declaring that the PACT board was liable to PACT contract holders for the sums guaranteed in their respective contracts. In September 2009, Green’s complaint was dismissed on the ground that the stated claims were not ripe because, the trial court concluded, no PACT beneficiary had yet been denied contractual benefits and, therefore, no PACT beneficiary had suffered a loss. Green subsequently filed a motion to alter, amend, or vacate the trial court’s judgment.
The action underlying these appeals (case no. CV-10-900013) was instituted by a separate complaint filed in January 2010 — while Green’s postjudgment motion *350 in the first action, case no. CV-09-900351,[2] remained pending — against the PACT board in the Montgomery Circuit Court by Lisa Nix Green; Brent A. Green; Blake Green; Eldridge M. Franklin;[3] Ea-son L. Franklin; and Kimberly H. Franklin, individually and as next friend of John Stephen Franklin, all of whom were PACT contract holders and/or PACT beneficiaries, who purported to represent “a class of persons who purchased a [PACT] contract prior to May 9, 2001,” and the designated beneficiaries of each such PACT contract. That same pleading also included as plaintiffs Brian A. McVeigh, individually and as next friend of Sarah K. McVeigh; Allen R. Hudson, individually and as next friend of Emma L. Hathaway; and Nina McGinnis, individually and as next friend of Stevie A. Graves, who purported to represent “a class of persons who purchased a [PACT] contract [on or] after May 9, 2001,” and the designated beneficiaries of each such PACT contract. The underlying class action was assigned to a different judge in the Montgomery Circuit Court than the judge who presided over Green’s separate action.[4]
In their complaint in the underlying action, which included claims virtually identical to those asserted by Green in her initial action, the above-named plaintiffs alleged that their claims were typical of and consistent with the claims of all class members, whose numbers allegedly made joinder impractical, and sought to be named representatives for their respective classes. Acting under the premise that the PACT program was created to allow the designated beneficiary of a PACT contract to attend college without being required to pay tuition or mandatory fees, regardless of the financial health of the PACT Trust Fund and/or the ability of the PACT program to pay, the plaintiffs alleged that the PACT board had indicated its inability to fulfill outstanding PACT contracts. The complaint also alleged, in a claim not included in Green’s initial action, that, at the time of filing, “not all of the tuition and fees covered by PACT contracts [were] being paid by the [PACT board].”[5] The plaintiffs requested a declaratory judgment construing the respective rights and obligations of the individual *351 classes under the PACT contracts and the controlling statutes so they could decide whether to remain in the PACT program or to cancel their existing contracts and seek a refund (less any applicable tax penalty). They also stated a claim under 42 U.S.C. § 1983, alleging violations of rights guaranteed by various provisions of the United States Constitution.
The PACT board answered and filed a counterclaim. In its “counterclaim for declaratory relief,” the PACT board alleged that, based upon actuarial projections, the PACT Trust Fund lacked sufficient assets to continue payment of full tuition expenses past the year 2015. The PACT board further noted that it had “adopted proposed amendments to its existing rules and regulations,” which, though specifically aimed at remitting payment for mandatory fees and expenses to all PACT contract holders, might result in payment of “an amount less than the full tuition and fees charged by the respective college or university[4]’ in direct conflict with the plaintiffs’ interpretation of their contract rights. Thus, the PACT board requested, pursuant to Ala.Code 1975, § 6-6-220 et seq.[6] and § 19-3B-101 et seq.,[7] the trial court’s assistance in construing the PACT board’s powers and responsibilities under the statutes establishing the PACT program; a determination as to whether the proposed changes to its rules and regulations violated the statutory, constitutional, or contractual rights of the PACT contract holders and/or the PACT contract beneficiaries; and a determination as to whether the PACT board could liquidate the PACT Trust Fund and distribute the remaining assets.
The plaintiffs thereafter moved for class certification of the two proposed classes pursuant to Rule 23(b)(1) and (b)(2), Ala. R. Civ. P.
While this case was pending, the legislature enacted Act No. 2010-725, Ala. Acts 2010, which was effective April 30, 2010, and which, among other things, amended the statutory provisions relating to the PACT program to provide annual appropriations to the PACT Trust Fund beginning in 2015 and continuing through 2027.[8] See Ala.Code 1975, § 16-33C-1 et seq. According to § 16-33C-16, the stated annual appropriations “will make the PACT Program 100 percent fully funded, according to the actuarial professional retained by the PACT board.” Additionally, with regard to the tuition and mandatory-fee rates for all PACT contract holders, the 2010 amendment provides that, with the exception of “institutions of higher edu *352 cation under the oversight of the boards of trustees established in Section 264 and Section 266 of the Constitution of Alabama of 1901, now appearing as Sections 264 and 266 of the Official Recompilation of the Constitution of Alabama of 1901,”[9]
“no public institution of higher education shall charge the PACT plan or a PACT plan contract owner mandatory fees or tuition per credit hour in an amount exceeding the cost of mandatory fees or tuition per credit hour as of September 30, 2009....”
§ 16-33C-17(a), Ala.Code 1975.
The 2010 amendment further provides that
“the amounts paid by the PACT Program to public institutions of higher education in accordance with this section shall be considered full payment of mandatory fees or tuition per credit hour on behalf of the beneficiary of the PACT contract, and neither the beneficiary of the PACT contract nor the PACT contract holder shall be required to remit to the public institution of higher education an additional amount for mandatory fees or tuition per credit hour.”
§ 16-33C-17(c), Ala.Code 1975.
Finally, the legislature in Act No. 2010-725
“strongly encourage[d] the PACT board to make any financially beneficial changes to PACT rules, procedures, or policies, to the extent that the PACT board is authorized or permitted to make such changes and to the extent that such changes would not violate the contractual relationship existing between a PACT contract holder and the PACT board.”
§ 16-33C-19, Ala.Code 1975 (emphasis added).
In response to the passage of Act No. 2010-725, the PACT board filed a motion seeking to dismiss the plaintiffs’ claims on the ground “that recent legislation [had] rendered [the] Plaintiffs’ claims moot.” More specifically, the PACT board argued in support of its motion that the plaintiffs’ claims were based upon the premise that the PACT program would, at some future date, be unable to fulfill all outstanding obligations and that Act No. 2010-725 resolved all such concerns; therefore, it contended, the legislation had rendered any controversy moot and thereby had deprived the trial court of jurisdiction. After a hearing, the trial court denied the PACT board’s motion without explanation.
Following the PACT board’s filing of a stipulation evidencing its qualified, general agreement that class-based relief was proper, the trial court in December 2010 entered an order of class certification. Specifically, the trial court found that the underlying action was “an appropriate case for class certification for the Plaintiffs under Rule 23(b)(2), [Ala. R. Civ. P.,] and for the [PACT board] on [its] Counterclaim under Rule 23(b)(l)(A)(B) [sic] [, Ala. R. Civ. P.],” and certified several classes and subclasses.[10] In its certification order the trial court further found that, with regard to its counterclaim, the PACT board was entitled to the requested declaratory relief *353 and/or “to guidance, instructions and, if necessary, modification of the [the PACT] Trust pursuant to the Alabama [Uniform] Trust Code[, Ala.Code 1975, § 19-3B-101 et seq.].” The trial court’s order included a notice to be mailed to class members and posted on the Internet Web site for the PACT program informing class members that the trial court “ha[d] certified that the case shall proceed as a class action” and that copies of the pleadings and the trial court’s order were available on the Internet Web site of the State Treasurer.[11]
Subsequent to the entry of the trial court’s certification order, some of the plaintiffs filed a motion seeking to compel mediation of the parties’ respective claims. The matter thereafter proceeded to mediation upon consent of the parties.
On May 5, 2011, the parties submitted a joint motion, along with a proposed settlement agreement, requesting that the trial court approve the proposed class-action settlement agreement, the professed purpose of which was “to provide Class Members with the maximum amount of benefits from the available assets.” In order to effect that stated purpose, the proposed settlement agreement purported to modify the terms of the outstanding PACT contracts. The proposed modification was accompanied by a purported waiver by the class members of the application of Ala. Code 1975, § 16-3SC-1 et seq., and the terms of their individual PACT contracts to the extent the provisions in either the statutes or the PACT contracts were inconsistent with the terms of the settlement agreement.
Additionally, the proposed settlement agreement set tuition and fee payments at tuition and fee rates applicable for fall 2010; provided that class members waived the provisions of § 16-33C-17, as set out above; and required class members to be personally responsible for payment of any tuition and fees not covered by the PACT program payments. Class members were also afforded, as an alternative remedy, the right to cancel their PACT contracts and to receive refunds less any applicable taxes or penalties.
The settlement agreement also included, as part of its terms, an award of attorney fees to class members’ counsel in the amount of $4,950,000 and an award for litigation-related expenses in the amount of $15,000. The settlement agreement also contained a release of class members’ potential claims against the PACT board (“and all other related persons and entities”), including the following:
“[A]ny and all matters, demands, liabilities, actions, lawsuits, liens, debts, damages, obligations, claims, and any other expenses, charges, or costs of every kind and nature, known or unknown, suspected or unsuspected, howsoever arising, at law or in equity, whether on an individual or representative basis, which were asserted or which could have been asserted as of the execution of this Settlement, including (but not limited to) those claims which were asserted or which could have been asserted in [the underlying action] as well as any and all other claims relating to the operation and ad *354 ministration of the PACT Program and/or the PACT Trust Fund, including (but not limited to) the payment/nonpayment of tuition and fees and all claims available under the Uniform Trust Code ... other than the obligations embodied in this Settlement and any judgment entered by the court approving or adopting this Settlement.”
On May 5, 2011 — the same date the proposed settlement agreement was submitted — the trial court entered an order preliminarily approving the proposed settlement agreement and setting a fairness hearing. Thereafter, pursuant to Rule 23(e), Ala. R. Civ. P., notice of the proposed settlement was purportedly provided to all class members,[12] who were given until June 10, 2011, to file written objections to the proposed settlement agreement. In response, numerous written objections were filed with the trial court by class members.
At the subsequent fairness hearing, the PACT board offered the expert testimony of Daniel Sherman, an actuary employed by the PACT board. Sherman explained that, although the PACT Trust Fund had, in the past, operated at a surplus, he calculated a deficit, in the spring of 2009, of $460 million. According to Sherman, although the legislature appropriated approximately $548 million to the PACT program in Act No. 2010-725, subsequent evaluations revealed a $269 million deficit, which he attributed to “the increase in tuition levels at the Auburn [University] and [the University of] Alabama school systems,” which increases, he said, were higher than the legislature had projected in reaching the determination that its 2010 appropriations had fully funded the PACT program. Sherman’s quarterly evaluation in December 2010 revealed that “the deficit [had] increased from [$] 269 million ... to [$] 338 million.” Sherman testified that, faced with evidence of the increasing deficit, even with the 2010 legislative appropriations, the assets of the PACT Trust Fund were insufficient to meet its future liabilities.
Regarding the proposed settlement, Sherman explained that it was aimed at ensuring that the available moneys were evenly distributed so that as many beneficiaries as possible received as much as possible and to make sure that the PACT program was fully funded on an actuarial basis. According to Sherman, the limitation in the settlement agreement on tuition increases, which limits tuition payments by the PACT Trust Fund to the fall 2010 rate as certified by each affected school, rendered the settlement actuarially viable— even with the reduction in assets associated with the attorney-fee award and any potential cancellations of PACT contracts by class members. He further noted that the investment of the PACT assets in fixed-income investments was also a central component of the proposed settlement agreement in that it was aimed at preserving the remaining capital in the PACT Trust Fund.
Regardless, Sherman acknowledged that the settlement, because of the variability of both tuition amounts and investment return, did not eliminate all future risk. While admitting that the previous actuarial assumptions underlying the legislative appropriations in Act No. 2010-725 turned out to be incorrect, Sherman testified that the probability that the actuarial assumptions underlying the proposed settlement agreement were accurate was much higher because of the elimination of the risks *355 associated with tuition increases and investment losses. Sherman also acknowledged that nothing was absolute, that his calculations were merely “based on assumptions,” and that there was no guarantee that the proposed settlement would ensure that the PACT Trust Fund would be fully funded. However, Sherman noted that, under the terms of the proposed settlement agreement, each contract holder would actually receive much more money than he or she would receive by a mere refund.
The chairman of the PACT board testified and confirmed that based on Sherman’s December 2010 report, even with the inclusion of the $548 million in legislative appropriations included in Act No. 2010-725, the PACT Trust Fund remained underfunded by $338 million. He further confirmed that, because of unanticipated tuition increases and the fact that the investments of the PACT Trust Fund had not performed as well as anticipated, the obligations of the PACT Trust Fund far exceeded its assets. The chairman of the PACT board testified that the PACT board, acting alone, had no knowledge of or access to any solution or other moneys that would allow it to provide full contract benefits to all PACT contract holders. The chairman, therefore, opined that the proposed settlement was fair and reasonable to all class members and recommended its approval.
At the conclusion of the PACT board’s evidence, 13 objectors, who were present and who had filed written objections in the trial court, were provided an opportunity to argue in opposition to the proposed settlement. The various objectors raised numerous issues, including the argument that the settlement was contrary to Act No. 2010-725.
By order entered July 27, 2011, the trial court entered a final judgment approving the proposed settlement agreement. The trial court’s finding that the settlement was fair, adequate, and reasonable was explained in its 35-page order in which it both considered the factors outlined by this Court in Adams v. Robertson, 676 So.2d 1265, 1273 (Ala.1995), and purported to resolve the concerns of the objectors.
Following the entry of the trial court’s judgment, the PACT board on August 9, 2011, paid to the clerk of the trial court $4,977,500 in satisfaction of the outstanding judgment for attorney fees, case-related expenses, and amounts awarded to the class representatives pursuant to the terms of the settlement agreement. On that same date, Perdue filed her notice of appeal.
The next day, class counsel petitioned the trial court for disbursement of the funds on deposit with the clerk of the trial court. That motion specifically referenced Perdue’s pending appeal but stated that Perdue had failed to “include a supersede-as bond necessary to stay the above judgment.” The following day, despite its awareness of Perdue’s pending appeal, the trial court entered an order permitting immediate disbursement of the funds.[13] In *356 that order, the trial court explicitly acknowledged Perdue’s pending appeal but concluded that Perdue’s notice “specifically declined any attempt to supersede any of the judgments entered by the Court.” On August 23, 2011, Perdue moved this Court to stay the trial court’s judgment. Motlow and Sears filed their notice of appeal on September 7, 2011. We have consolidated the appeals for the purpose of writing one opinion. On November 18, 2011, this Court stayed execution of the trial court’s judgment.

Standard of Review

[1-3] “[T]he standard of review applicable to a trial court’s approval of a proposed settlement of a class action is as follows:
“ ‘There can be no settlement [of a class action] without the trial court’s approval. Rule 23(e) [Ala. R. Civ. P.]. Requiring the trial court’s approval of the settlement protects the class from unjust settlements or voluntary dismissals. The burden is on the proponents of the settlement to show that it is fair, adequate, and reasonable. This Court’s standard of review is to determine whether the trial court abused its discretion. Great weight is given to the trial court’s views, because that court has been “exposed to the litigants, and their strategies, positions, and proofs.” ’
“Adams v. Robertson, 676 So.2d 1265, 1272-73 (Ala.1995) (citations omitted).”
Disch v. Hicks, 900 So.2d 399, 404 (Ala. 2004).

Discussion

It is clear that the legislature, in enacting Act No. 2010-725, attempted to rectify the financial difficulties of the PACT program. Act No. 2010-725 provided supplemental funding to the program, placed a limitation on tuition costs, and authorized the PACT board to make certain changes for the benefit of the PACT program. That said, the legislature also clearly undertook to preserve the benefits originally promised to PACT contract holders. Section 12 of Act No. 2010-725, now codified at § 16-33C-19 and quoted above, provides that the PACT board was “strongly encouraged” to make “any financially beneficial changes to PACT rules, procedures, or policies, to the extent that the PACT board is authorized or permitted to make such changes and to the extent that such changes would not violate the contractual relationship existing between a PACT contract holder and the PACT board.” The PACT board was thus encouraged to make changes, but limited in making only those changes that “would not violate” the then “existing” contractual relationship between it and the contract holders.[14] On appeal, the objectors claim, *357 among other things, that approval of the settlement agreement impermissibly contravenes Act No. 2010-725.
The settlement agreement states: “The purpose and effect of this Settlement shall be to modify the dispositive terms of the PACT Trust Fund and/or the terms of the contractual relationships between Class Members and the PACT Board.”[15] It was undisputed in the trial court and it is undisputed on appeal that the terms of the settlement agreement alter the contract of each PACT contract holder, although there is some dispute as to how differing versions of the PACT contracts are affected. The objectors do not consent to any such modification of their contracts or waive any statutory rights. Thus, to the extent the PACT board acted to change its existing rules, procedures, or policies to accept modification of the PACT contracts, as it indicated in its counterclaim that it had done, it violated the contractual relationship with the PACT contract holders by exceeding the express limitation set out in § 16-33C-19.
Green and the other appellees contend that § 16-38C-19 does not prohibit the underlying settlement because, they argue, that Code section was clearly predicated on the legislature’s mistaken belief that, in light of the accompanying appropriations in Act No. 2010-725, the PACT program was 100 percent funded. They further maintain that the contravention by the settlement of that express statutory provision was permissible because “the settlement did not reflect a unilateral change by the PACT Board” and that “§ 16-33C-19 would only apply to changes made unilaterally by the PACT Board.” (Appellees’ brief, at p. 21.) Instead, they say, the settlement agreement represents “a mutual compromise entered by all affected parties.” (Appellees’ brief, at p. 21.)
However, Green and the other appellees cite no support for the proffered statutory construction, and this Court sees nothing within the prohibitory language of § 16-33C-19 indicating that the prohibition was contingent on the funding status of the PACT program. “When the language of a statute is plain and unambiguous, as in this case, courts must enforce the statute as written by giving the words of the statute their ordinary plain meaning — they must interpret that language to mean exactly what it says and thus give effect to the apparent intent of the Legislature.” Ex parte T.B., 698 So.2d 127, 130 (Ala.1997). This is true even if “we might sometimes think that the ramifications of the words [in a statute] are inefficient or unusual.... [I]t is our job to say what the law is, not to say what it should be.” DeKalb Cnty. LP Gas Co. v. Suburban Gas, Inc., 729 So.2d 270, 276 (Ala.1998).
*358 Further, it has long been the law of this State that every contract “adverse to the enactments of the legislature, is illegal and void.” Carrington v. Caller, 2 Stew. 175, 192 (Ala.1829) (citing Wheeler v. Russell, 17 Mass. 258 (1821)(emphasis added)). As noted in Carrington, this rule is premised on the universal principle that “[c]ourts of justice will not open their forums to enforce contracts which are illegal, immoral, prohibited or contrary to public policy. For to do this would be to sanction by law, what the law itself forbids.” 2 Stew, at 206 (opinion of White, J.). See also Alfa Specialty Ins. Co. v. Jennings, 906 So.2d 195,199 (Ala.Civ.App.2005) (reiterating this Court’s belief that a cautionary approach should be taken in refusing to enforce contractual provisions on the ground that they violate public policy in light of the danger that “ ‘ “courts are apt to encroach upon the domain of [the legislative] branch of the government if they characterize a transaction as invalid because it is contrary to public policy, unless the transaction contravenes some positive statute or some well-established rule of law” ’ ” (quoting Milton Constr. Co. v. State Highway Dep’t, 568 So.2d 784, 788 (Ala.1990), overruled in part on other grounds by Ex parte Alabama Dep’t of Transp., 978 So.2d 17, 23 (Ala.2007), quoting in turn 17 Am.Jur.2d Contracts § 178 (1964) (emphasis omitted))); Turner v. Merchants’ Bank, 126 Ala. 397, 403, 28 So. 469, 471 (1900) (noting that the “implied prohibition” under which usurious contracts “are held to be vitiated in toto is that they contravene a penal statute, and the enforcement by the courts of such contracts when relief is sought upon them, would be in derogation of a sound principle, necessary to be maintained in order to uphold the supremacy of the law and the dignity of the state”); White Water Valley Canal Co. v. Vallette, 62 U.S. 414, 425, 21 How. 414, 16 L.Ed. 154 (1858) (“The courts, from public considerations, refuse their aid to enforce obligations which contravene the laws or policy of the State.”); White v. Alabama, 74 F.3d 1058, 1069-70 (11th Cir.1996) (vacating settlement order in class action seeking relief under Voting Rights Act as void where order crafted “remedy that [had] the effect of eliminating [the] essential element of choice ... for it contravene[d] the spirit and purpose of the Act”); United States v. Allegheny-Ludlum Indus., Inc., 517 F.2d 826, 850 (5th Cir.1975) (stating that “[appellate court’s] only alternative, if it were shown that [the trial court] abused [its] discretion or overlooked an illegal provision, would be to vacate [its] approval of the entire settlement”); and Atlantic Co. v. Broughton, 146 F.2d 480, 482 (5th Cir.1945) (“Though settlements in accord and satisfaction are favored in law, they may not be sanctioned and enforced when they contravene and tend to nullify the letter and spirit of an Act of Congress.” (citing Guess v. Montague, 140 F.2d 500 (4th Cir.1943) (emphasis added))). Cf. State Farm Mut. Auto. Ins. Co. v. Scott, 707 So.2d 238, 242 (Ala. Civ.App.1997) (holding that “pertinent provision of State Farm’s [insurance] policies contravene[d] § 32-7-23[, Ala.Code 1975,] and [was] therefore void”). Here, it would contravene the plain language of § 16-33C-19 to allow the implementation of a settlement agreement that clearly “violate[s] the contractual relationship existing between [the] PACT Contract holder[s] and the PACT board.” Thus, however well-intentioned, the settlement agreement is clearly contrary to state law.[16]
*359 As to the argument that the modification of the PACT contracts by the settlement agreement is a mutual compromise and not a unilateral act by the PACT board, we note that the objectors do not have the ability to opt out of the class action or the settlement agreement. Adams v. Robertson, 676 So.2d 1265, 1270 (Ala.1995) (“Class members in a Rule 28(b)(1) or 23(b)(2) lawsuit do not have the choice of opting out of the class action.”). As noted previously, the objectors do not agree to the “compromise” or alteration of the contractual relationship or to a waiver of their statutory rights,[17] and the settlement agreement deviates from the authority conferred on the PACT board and diminishes the objectors’ contractual benefits in derogation of the statutory directive of § 16-33C-19. Although the number of objectors is relatively small,[18] there nonetheless exists no unanimous collective waiver of a right or a mutually agreed upon reformation of the “contractual relationship.” Nothing before us indicates that the PACT board may be permitted to trump the statutory limitations on its power and the statutory rights of the PACT contract holders on the basis of majority rule and then force a “mutual compromise” on the objectors under Rule 23(b)(1) and 23(b)(2), Ala. R. Civ. P.
The trial court’s final judgment approving the terms of the proposed settlement agreement stated, and Green and the other appellees contend, that the trial court derived its authority, at least in part, to approve portions of the proposed settlement agreement from § 19-3B-412, Ala. Code 1975, which provides, in pertinent part:
“(a) The court may modify the administrative or dispositive terms of a trust or terminate the trust if, because of circumstances not anticipated by the set-tlor, modification or termination will further the purposes of the trust. To the extent practicable, the modification must be made in accordance with the settlor’s probable intention.
“(b) The court may modify the administrative terms of a trust if continuation of the trust on its existing terms would be impracticable or wasteful or impair the trust’s administration.”
This Code section recognizes the general power of a trial court to modify certain terms of a trust. Assuming, without deciding, that § 19-3B-412 even applies to the facts of this case, the legislature has spoken specifically and directly to the terms, conditions, and modifications to the PACT program proposed by the settlement agreement. Statutes relating to specific subjects control general provisions in statutes relating to general subjects; when the law descends to particulars, the specific provisions must be understood as exceptions to any general rules laid down to the contrary. Ex parte E.J.M., 829 So.2d 105, 108-09 (Ala. *360 2001); see also Ex parte Jones Mfg. Co., 589 So.2d 208, 211 (Ala.1991) (“[A] specific statute relating to a specific subject is regarded as an exception to, and will prevail over, a general statute relating to a broad subject.”).
In undertaking to remedy the financial problems facing the PACT program, the legislature has explicitly placed certain limits on the PACT board’s authority to craft solutions that would violate the contractual rights provided to PACT contract holders. Neither the PACT board, under § 16-33C-19, nor the judiciary, under Ala. Const.1901, § 43, has the authority to ignore the explicit statutory law specifically enacted to address a particular situation. See Ex parte Jones Mfg. Co., 589 So.2d at 210 (“An administrative agency cannot usurp legislative powers or contravene a statute. A regulation cannot subvert or enlarge upon statutory policy.” (citation omitted)); Finch v. State, 271 Ala. 499, 504, 124 So.2d 825, 830 (1960) (noting that the separation-of-powers doctrine of Ala. Code 1901, § 43, restrains the judicial branch “from imposing its methods or substituting its judgment for that of the executive and legislative branches of the government”); Champion v. McLean, 266 Ala. 103,117-18, 95 So.2d 82, 97 (1957) (observing that “[t]he power to make the law has been committed to the legislature by the Constitution” and that “‘[s]o long as no constitutional limitations are exceeded, the Legislature is of supreme authority, and the courts, as well as all others, must obey[5] ” (quoting State v. Birmingham S. Ry., 182 Ala. 475, 479, 62 So. 77, 79 (1913))); and L.C.S. v. J.N.F., 941 So.2d 973, 980 (Ala.Civ.App.2005) (stating both that “[i]t is well settled that in the absence of a valid constitutional challenge, the judicial branch is bound to enforce the will of the Legislature” and that “ ‘[t]he Legislature’s power should not be interfered with unless it is exercised in a manner which plainly conflicts with some higher law[1] ” (quoting Beasley v. Bozeman, 294 Ala. 288, 290, 315 So.2d 570, 571 (1975))). Therefore, we can reach no other conclusion but that the trial court exceeded its discretion in approving a settlement agreement that is plainly “adverse to the enactments of the legislature, [and] is[, therefore,] illegal and void.” Carrington, 2 Stew, at 192.
The settlement is void, and we must vacate the entire settlement agreement, i.e., as to all the parties. See In re Airline Ticket Comm’n Antitrust Litig., 953 F.Supp. 280, 284 (D.Minn.1997) (“[A]n illegal term would render a class action settlement invalid, ‘no matter how much the parties, for whatever reason, wanted it.’ ” (quoting Little Rock Sch. Dist. v. Pulaski Cnty. Special Sch. Dist., 921 F.2d 1371, 1384 (8th Cir.1990))); and Dillard v. Crenshaw Cnty., 748 F.Supp. 819, 823 (M.D.Ala.1990) (“The court also has a duty to ensure that the settlement is not illegal, against public policy, or the product of fraud or collusion.”). In reversing orders adopting class-action settlements, other courts, albeit in factually and procedurally dissimilar cases, have rejected the conclusion that objectors who appeal represent only their own interests and that any reversal of the settlement applies only to those objectors. See Hefty v. All Other Members of the Certified Settlement Class, 680 N.E.2d 843, 857 (Ind.1997) (reversing, upon appeal by six objecting class members, a class-action settlement and specifically rejecting the conclusion “that the Objectors represent only their individual interests in challenging the fairness of the settlement and that any reversal of the settlement approval would only apply to those Objectors who appealed at the time of the settlement and not to the whole class”), and In re General Motors Corp. Engine Interchange Litigation, 594 F.2d 1106, 1122 (7th Cir.1979) (“Limiting
*361 the representative capacity of the appellants on this appeal would effectively negate this court’s obligation to act as the guardian of the class. We do not believe that the interests of class members are best served by leaving the settlement unreviewed.” (citing McDonald v. Chicago Milwaukee Corp., 565 F.2d 416, 417 n. 1 (7th Cir.1977))). See also In re Katrina Canal Breaches Litig., 628 F.3d 185 (5th Cir.2010) (reversing, upon appeal by two groups of dissenting class members in a non-opt-out “limited fund mandatory settlement class” both the trial court’s class-certification order and, assuming the certification error was corrected on remand, reversing the trial court’s order approving the entire class-action settlement); Clark v. American Residential Servs., LLC, 175 Cal.App.4th 785, 96 Cal.Rptr.3d 441 (Cal. App.2009) (vacating, upon appeal by 20 objecting members of 2,362-member class, the trial court’s order approving the proposed class-action settlement); Hameroff v. Public Med. Assistance Trust Fund, 911 So.2d 827 (Fla.Dist.Ct.App.2005) (reversing, upon appeal by a single objecting class member, trial court’s amended order awarding attorney fees, which effectively altered a term of the approved settlement agreement); and Bloyed v. General Motors Corp., 881 S.W.2d 422 (Tex.App.1994) (reversing, in an appeal instituted by 3 objecting members of a class consisting of approximately 645,000 class members, the trial court’s approval of a class-action settlement on the grounds that it was not fair, adequate, and reasonable to class members and concluding, therefore, that, in approving settlement, the trial court had abused its discretion).
We are unaware of any precedent that supports the view that disapproval of a settlement agreement in a class action operates only to insulate an objector from the binding effect of a settlement agreement. Such a result would be particularly anomalous in the context of a class certified pursuant to Rule 23(b)(2), Ala. R. Civ. P., a mandatory class action designed to afford a class uniformity of relief. A member of a Rule 23(b)(2) class has no right to remove himself or herself simply by opting out as is the case in a class certified pursuant to Rule 23(b)(3). Adams, 676 So.2d at 1270. Nor does Devlin v. Scardelletti, 536 U.S. 1, 122 S.Ct. 2005, 153 L.Ed.2d 27 (2002), compel a different conclusion. In Devlin, the Supreme Court recognized the right of an objector to appeal a judgment approving a settlement in a class action where the class had been certified pursuant to Rule 23(b)(1), Fed.R.Civ.P. The Court observed:
“And like the appellants in the prior cases, petitioner will only be allowed to appeal that aspect of the District Court’s order that affects him — the District Court’s decision to disregard his objections .... Petitioner’s right to appeal this aspect of the District Court’s decision cannot be effectively accomplished through the named class representative — once the named parties reach a settlement that is approved over petitioner’s objections, petitioner’s interests by definition diverge from those of the class representative.”
536 U.S. at 9, 122 S.Ct. 2005 (emphasis added).
The subject of this appeal is the trial court’s judgment approving the settlement agreement and rejecting the objections to the settlement agreement advanced by the objectors. The scope of the objections in the trial court was not the narrow question whether the order should bind only the objectors, but, on the contrary, the issue presented is the broader question whether the trial court’s judgment approving the settlement agreement is due to be affirmed. In the parlance of the Devlin *362 Court, the objectors are allowed to appeal that aspect of the trial court’s order that affects them — “the [circuit court’s] decision to disregard [their] objections.” If the judgment is affirmed, the settlement agreement affects them in that it binds them, as members of the class, to terms of a settlement agreement inconsistent with § 16-33C-19.
We do not here deal with an attempt to assert an objection peculiar to the objectors and not the class as a whole. It is true that the objectors are different from the members of the class who have not objected in that the objectors have not acquiesced in the settlement agreement. However, if this circumstance alone creates a personal interest that can be resolved simply by protecting the objectors through reversal of the approval as to them and allowing the rest of the settlement agreement to stand, we would defeat the basis for certification of a mandatory class action pursuant to Rule 23(b)(2) by reaching a result that binds less than all members of the class. Indeed, if the objectors had sought to extract only themselves from the settlement agreement and the trial court had obliged and the other parties appealed, a substantial question would exist as to whether we would be required to reverse to protect the mandatory nature of a Rule 23(b)(2) class action.

Conclusion

The trial court’s judgment entered on the settlement agreement is vacated and this case is remanded for further proceedings.
1101337 — JUDGMENT VACATED AND CAUSE REMANDED.
1101506 — JUDGMENT VACATED AND CAUSE REMANDED.
WOODALL, PARKER, and SHAW, JJ., and LYONS and PITTMAN, Special Justices,* concur.
HOUSTON, Special Justice,* concurs specially.
MOORE, Special Justice,* dissents.
MALONE, C.J., and STUART, BOLIN, MURDOCK, MAIN, and WISE, JJ., recuse themselves.

. Perdue’s daughter, Anna, is the designated beneficiary of the PACT contract purchased by Perdue.

. Green submitted a proposed consent order in case no. CV-09-900351 providing for both an amendment of the trial court’s initial order of dismissal to reflect that Green's previous complaint was "dismissed without prejudice” and consenting to the denial of Green’s post-judgment motion and the dismissal of the accompanying amended complaint. The trial court adopted that proposed consent order by a judgment entered on March 5, 2010.

. Eldridge M. Franklin later withdrew his request to serve as a class representative.

. Perdue contends both that Green’s duplica-tive filings demonstrate "obvious efforts at judge shopping” and that the underlying action is due to be dismissed pursuant to Alabama’s abatement statute, § 6-5-440, Ala. Code 1975, which provides that ”[n]o plaintiff is entitled to prosecute two actions in the courts of this state at the same time for the same cause and against the same party.” The prohibition in § 6-5-440, however, is " ‘an affirmative defense, and if that defense is not raised by the defendant in a motion to dismiss, ... it is waived.' ” Regions Bank v. Reed, 60 So.3d 868, 884 (Ala.2010) (quoting Veteto v. Yocum, 793 So.2d 814, 815 n. 1 (Ala.Civ.App.2001)). See also First Tennessee Bank, N.A. v. Snell, 718 So.2d 20, 27 (Ala. 1998) ("[A] defendant must raise the first-filed action as a defense in a motion to dismiss.”). The PACT board did not challenge the action on the basis of abatement. Further, any issue as to abatement vanished at the conclusion of Green's initial action.

.It appears that the plaintiffs’ allegation that the PACT program had failed to pay certain non-tuition-related "mandatory fees” incurred by then matriculating PACT beneficiaries was added in order to clear the ripeness hurdle that had defeated Green’s earlier filed action.

. Alabama's “Declaratory Judgment Act.”

. The stated chapter is entitled "Alabama Uniform Trust Code.” Section 19-3B-201(c), which was specifically referenced in the PACT board’s counterclaim, provides that a court may entertain a “judicial proceeding ... relating] to any matter involving the trust’s administration, including a request for instructions and an action to declare rights.” Additionally, subsection (d) further provides that, in addition to a request for instructions, a judicial proceeding arising from the administration of a trust may also be instituted to
“determine the existence or nonexistence of any immunity, power, privilege, duty or right;
"... approve a nonjudicial settlement;
[[Image here]]
"... review the actions or approve the proposed actions of a trustee, including the exercise of a discretionary power;
[[Image here]]
"... [and] modify or terminate a trust....”

.The record reflects that the PACT board closed the PACT program to new applicants in 2009 but that, based upon the ages of the beneficiaries of the PACT contracts, the contractual obligations of the PACT Trust Fund are projected to continue until at least 2029.

. This exception refers to the University of Alabama ("Alabama”) and to Auburn University ("Auburn”). According to the testimony presented during a hearing, 53 percent of students attending college on a PACT contract, representing 64 percent of the PACT Trust Fund's cash flow, attend Alabama and Auburn.

. There is no dispute that Perdue, Motlow, and Sears are all members of a class or subclass certified by the trial court, and there is no dispute as to the content of the PACT contracts of each class or subclass.

. In the trial court, the PACT board did not oppose class certification; it stipulated to such certification. At the fairness hearing that occurred after the classes were certified, some of the objecting class members offered arguments as to the propriety of the class certification, but those challenges were only minimally addressed or developed. On appeal, Motlow and Sears offer general arguments and authority attacking the class certification; however, their arguments appear to be a variation of their arguments attacking the fairness of the settlement. Given our resolution of the propriety of the settlement, we see no need to address that issue.

. At the direction of the trial court, notice was provided by mail to class members whose addresses were discernible from the records of'the PACT program and, in addition, notice was posted on the Web site devoted to the PACT program.

. In establishing the “effective date” of the settlement agreement, the terms of the settlement agreement specifically provide: *356 (Emphasis added.) The disbursement of the attorney fees appears contrary to this provision.
*355 "No action shall be taken to implement the terms of this Settlement unless and until an order approving the Settlement has been entered by the court and has become final. Such an order shall be deemed to be final (1) if no objections to the proposed Settlement have been filed within the time specified by the court, (2) if forty-three days have elapsed since the entry of such judgment and no notice of appeal has been filed, or (3) if a notice of appeal is filed, upon the appeal being dismissed or upon the court’s judgment being affirmed, whichever shall first occur.”

. "Contractual relationship” is not explicitly defined by Act No. 2010-725. That said, the legislature clearly believed that a contractual relationship was something that could be "violat[ed]” in its "existing” state by the powers granted the PACT board in § 16-33C-19. Thus, § 16-33C-19 expressly limits the PACT board’s power to make changes to the PACT program. Given the language in that Code section, “contractual relationship” cannot simply refer to the general status of the parties as being in a relationship by virtue of a contract. Specifically, it is difficult to envision how such a status could be altered from its "existing” state or “violat[ed]” by the powers granted to the PACT board in § 16-33C-19; thus, if “contractual relationship” simply refers to the fact that the parties remain in a contract, then the legislature’s limitations on the PACT board’s power under § 16-33C-19 would be superfluous. Had the legislature intended merely to preserve some sort of contractual relationship, it could have easily, with slight alterations of the existing text, *357 employed words to convey that message by authorizing changes "to the extent that such changes would not do away with the existence of a contractual relationship between a PACT contract holder and the PACT board.” Reaching such a conclusion as to legislative intent without support from the text of the act would violate settled principles of separation of powers.
"Contractual relationship” must instead refer to the terms and obligations of the contract between the parties: in other words, "contractual relationship” must consist of the terms of the contractual relationship "existing” and in place at the time Act No. 2010-725 was passed, because only the terms of the contract — and not the relationship of the parties — were susceptible to a violation of their "existing” state by the powers granted the PACT board in § 16-33C-19.

. The PACT board’s counsel plainly acknowledged during the fairness hearing that the parties were "ask[ing] that [the trial] court modify the terms of the [PACT] contracts] so that [the PACT Trust Fund] will be viable, and that the trust purpose will not be frustrated.”

. During the fairness hearing, the trial court asked the chairman of the PACT board whether, "if [the trial court] gave approval to [the proposed] settlement, [the court] would ... be violating the laws of the State of Ala *359 bama.” The chairman responded: “I believe it would.”

. Thus, it cannot be said that “all” PACT contract holders agree to the settlement or waiver or that any "mutual” agreement to alter the terms of the PACT contracts was unanimous.

.
”[I]n sophisticated settlements when the majority of absent class members are usually unrepresented by counsel and possess insufficient knowledge to evaluate the fairness of the settlement, an inference [based on the number of objectors] should not be controlling. Despite a lack of opposition, the court should not lose sight of its responsibility to analyze independently and intelligently the settlement.”
4 Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 11:48 (4th ed.2002).

. As noted in Perdue, Act No. 2010-725 amended the statutory provisions relating to the PACT program to provide annual appropriations to the PACT Trust Fund beginning in 2015 and continuing through 2027.

. The trial court’s "Amended Order of Class Certification" reflects that "[the] matter came before [the trial court] for hearing on certification of this case as a class action.” It further reflects that the decision to certify was based upon "full consideration of ... arguments presented.” It therefore appears that the trial court conducted a hearing on the issue of class certification. We note, however, that when Perdue's counsel presented ar *392 gument regarding the non-opt-out status of the class during the fairness hearing, the following exchange occurred:
"THE COURT: Listen. But what I’m saying, when the whole class was in it ... shouldn’t potential class members have objected at that time?
"[Perdue’s counsel]: They — they could have objected, Your Honor.
"THE COURT: Okay. That’s what I'm saying. That’s all.
[Perdue’s counsel]: But I'm — I’m not—
"THE COURT: Doesn’t the rule[ ] require that? Rule 23, doesn't it require that?
"[Perdue’s counsel]: Actually, Your Hon- or, you didn’t schedule a hearing on this and you didn’t ask for objections on this. All that was said—
"THE COURT: Went [sic] sent a—
"[Perdue’s counsel]: A legal notice. You didn't tell anybody to complain or to bring an objection.
"THE COURT: But listen. People have a right to hire lawyers whenever they want to.
"[Perdue’s counsel]: Certainly they do. Your Honor. And they also have a right to get fair notice and due process when there’s litigation pending before the Court.
"THE COURT: Well—
"[Perdue’s counsel]: And—
"THE COURT: —they did have notice.
"[Perdue’s counsel]: Of this hearing.”
Although we note that the appellate record contains no transcript of a class-certification hearing, given the ambiguity of the foregoing and in light of the plain language of the trial court's order, we assume that the trial court entered that order, as indicated, following a hearing on that issue. Regardless, however, we note that we have previously declined to hold "that a pre-certification evidentiary hearing is required in every case — or even in most cases.” Ex parte First Nat'l Bank of Jasper, 717 So.2d 342, 346 (Ala.1997). See also § 6-5-641(d), Ala.Code 1975 (providing that the trial court "shall” hold an evidentiary hearing "on motion of any party”). Further, because we uphold the certification of a non-opt-out class under Rule 23(b)(1) and (b)(2), Ala. R. Civ. P., see Part II.A.2, infra, any procedural error in this regard is harmless.